STATE OF MINNESOTA *vs.* WILLIAM DONALDSON and another. (Two Cases.)

June 18, 1889.

**Constitution—Subject of Law Expressed in Title.**—The title of chapter 147, Laws 1885, to wit, "An act to regulate the practice of pharmacy, the licensing of persons to carry on such practice, and the sale of poisons in the state of Minnesota," sufficiently expresses the subject of regulating the sale of drugs and medicines not poisons.

**Same—Scope of Act Regulating Practice of Pharmacy—Sales of Patent Medicines and Articles having Other besides Medicinal Uses.** The provision permitting shop-keepers, (not pharmacists,) whose places of business are more than one mile from a drug-store, to sell the commonly used medicines and poisons, if put up by a registered pharmacist, but prohibiting such sales within that distance, is not an arbitrary discrimination, but reasonable in view of the necessities and convenience of those who reside at a distance from a regular drug-store. The proviso

in the twelfth section construed as excepting generally from the provisions of the act the sale of "patent or proprietary medicines." The act *held* to apply only to articles whose primary and principal uses are medicinal, and commonly understood as medicines, and as not including (at least when not prepared and sold for medicinal purposes) articles commonly used in the arts or industrial pursuits, or for domestic purposes; although also frequently used in compounding medicines. The sale of borax, not for medicinal use, is not within the act.

These are two actions brought in the municipal court of Minneapolis, in each of which the plaintiff seeks to recover $100 from defendants for alleged violation of Laws 1885, *c.* 147,—the act to regulate the practice of pharmacy. The following facts are admitted in the pleadings: The defendants keep a large retail department store at the corner of Nicollet avenue and Sixth street, and not more than one mile from a drug or apothecary shop. They sell dry goods, notions, and toilet articles, (including soaps, perfumes, etc.,) such as are usually kept for sale by druggists, and patent and proprietary medicines. They do not conduct a pharmacy nor do they vend, compound, or sell drugs or poisons. They are not, nor are their clerks who made the sales complained of, registered pharmacists or registered assistants.

In the first case the sales charged and admitted were of "one bottle of Fellows' Compound Syrup of Hypophosphates" and one bottle of "Ayer's Sarsaparilla." These are patent or proprietary medicines, prepared by skilled and responsible manufacturers, are simple, harmless, and very extensively used, and are commonly purchased and used independent of any physician's prescription. The articles sold were in the same condition in which they are sold by druggists, viz., contained in the original sealed bottles in which they were prepared for sale, enclosed in the wrappers placed around the bottles by the manufacturers, on which and on the bottles are explicit and sufficient printed directions for use, the conditions for which the articles are specifics or beneficial, and the quantity in which and the time when to be taken, being the same directions with which they are sold by druggists. At the time of these sales these patent medicines were commonly sold by retail shopkeepers whose places of business were more than one mile from any drug or apothecary shop.

In the second case the sales were of "one pound of borax" and "one pint of beef, iron, and wine." The latter is prepared by skilled manufacturers of medicine, but is not a patent or proprietary medicine. It is not a drug or poison, being a simple, wholly harmless, and well-recommended tonic and medicine for the blood, in very extensive use, and commonly purchased and used independent of any physician's certificate. Borax is not a drug or poison, but a salt formed of boracic acid and soda. It is largely used in metallurgy, is especially useful in soldering, and is as much used or more in the arts than in the preparation of prescriptions or the compounding of medicines. It is in general and extensive use for cleansing and other domestic and household purposes, and is a simple and exceedingly helpful agent applicable to many and the commonest wants of man wholly unconnected with physicians' prescriptions or the compounding of drugs or medicines. Its use is in no degree harmful to or likely to injure the public health. It is prescribed by physicians for medicinal use, and is often used by pharmacists in compounding medicines.

In each case the plaintiff moved for and obtained judgment on the pleadings for $100, and the defendants appealed.

Keith, Evans, Thompson & Fairchild, for appellants.

V. M. Gore, for the State.

MITCHELL, J. Most of the questions raised on these appeals are common to both, and hence the two may be considered together. The facts are correctly and fully set out in the statements prefixed to appellants' briefs, except that it should be added that the preparation called "Beef, Iron, and Wine," is not a "patent" or "proprietary" medicine, and that it has no other use but medicinal. The questions involved are the construction and validity of chapter 147, Laws 1885, entitled "An act to regulate the practice of pharmacy, the licensing of persons to carry on such practice, and the sale of poisons in the state of Minnesota." The first section of the act provides that it shall "be unlawful for any person, other than a registered pharmacist, to retail, compound, or dispense drugs, medicines, or poisons, or to institute or conduct any pharmacy, store, or shop for retailing, compounding, or dispensing drugs, medicines, or poi-

sons, unless such person shall be a registered pharmacist, or shall employ, and place in charge of such pharmacy, store, or shop, a registered pharmacist." The next 10 sections (the provisions of which are not assailed) relate to the qualifications required to become a registered pharmacist, the manner of admission and registration as such, and create a board of pharmacy, among whose duties is that of examining applicants for admission, and issuing certificates to those found qualified. Section 12 prohibits, under certain penalties, any person, not a registered pharmacist, from retailing, compounding, or dispensing medicines; and also prohibits any person from permitting the compounding and dispensing of prescriptions, or the vending of drugs, medicines, or poisons in his store or place of business, except under the supervision of a registered pharmacist: "*provided*, that nothing in this act shall, in any manner, interfere with the business of any physician in regular practice, or prevent him from supplying to his patients such articles as may seem to him proper, nor with the making of proprietary medicine or medicines placed in sealed packages with the name of the contents and of the pharmacist or physician by whom prepared or compounded, nor prevent shop-keepers, whose place of business is more than one mile from a drug or apothecary shop, from dealing in and selling the commonly used medicines and poisons, if such medicines and poisons are put up by a registered pharmacist, or from dealing in and selling of patent or proprietary medicines, nor with the exclusive wholesale business of any dealers, except as heretofore provided." Section 13 makes every proprietor or conductor of a drug-store responsible for the quality of all drugs, chemicals, and medicines sold or dispensed by him, "except those sold in the original package of the manufacturer, and except those articles or preparations known as ' patent ' or ' proprietary ' medicines." Section 14 prohibits the retailing of poisons commonly recognized as such, without labelling them "Poison."

1. The first point made against this act is that the provisions regulating or prohibiting the *sale* of drugs or medicines (not poisons) are invalid, because not expressed in the title. The line of argument by which this contention is supported is that the subject expressed in the last division of the title is the sale of poisons, and that the

only subjects expressed in the first two divisions are "regulating the practice of pharmacy," and "the licensing of persons to carry on such practice." We are then referred to the etymological definition of "pharmacy" as the science or art "of preparing and compounding medicines," as distinguished from their sale. But this is altogether too technical. It will not do to apply strict etymological definitions to the language of the enactments of a popular legislature. As a matter of fact, in this country the business of pharmacist or apothecary and druggist is all one; and the same person who prepares and compounds medicines also sells them; so that, in popular speech, all three are used interchangeably, as practically synonymous. It was with the regulation of pharmacy as an occupation or business, in its relations to the public, that the legislature had to do; and the term "practice of pharmacy," as used in the title of this act, is intelligible only as it includes the sale to the public of drugs and medicines. The title fully apprised the legislature of the general subject of the enactment, and all the provisions of the act are germane to that subject.

2. It is objected that the "one-mile" limitation in the proviso in the twelfth section is arbitrary, and not founded upon any natural or apparent reason suggested by necessity, or by such a difference in the situation or circumstances as suggests the necessity or propriety of a distinction; and it is claimed that for this reason the act is void. Doubtless, the use of impure medicines or dangerous drugs is just as injurious to those who buy them one mile from a drug-store as to those who buy them within that distance; and, if this was the only thing to be taken into the account, the discrimination would be purely arbitrary. But the legislature had to deal with this as a practical question, and had a right to take into consideration the convenience of the public. In sparsely settled districts, frequently there is no pharmacy or drug-store near at hand. In case of sickness it is often absolutely necessary to obtain medicinal remedies promptly, in order to save life. The question was, how far was it practicable to protect the public from the sale of impure or dangerous medicines and drugs, and at the same time have due regard to the convenience of those living at a distance from a drug-store? To meet the require-

ments of the situation, the legislature made an exception so as to allow shop-keepers whose place of business is more than a mile from a drug or apothecary shop to deal in and sell the commonly used medicines and poisons, if put up by a registered pharmacist; thereby protecting the public, especially in the centres of population where they most need it, as far as practically consistent with the convenience or necessities of those living in rural districts. We do not think that such a distinction is either arbitrary or unreasonable.

3. The next and most difficult question is the construction to be given to, and the application to be made of, the clause "or from dealing in and selling of patent or proprietary medicines," found in this same proviso. The state claims that this only applies to those named in the context immediately preceding, to wit, "shop-keepers whose place of business is more than one mile from a drug or apothecary shop," while defendant insists that it is a separate and independent provision, excepting generally from the operation of the act the business of dealing in and selling patent or proprietary medicines. Looking only at the immediate context, it must be admitted that the construction contended for by the state is not only the more natural one, but the only one consistent with the rules of grammar. But if we look at the entire proviso, which is all one sentence, we find it grammatically a jumble. In fact, it is incapable of a grammatical construction. It is evident, in the first place, that the expressions "not interfere with" and "or prevent" are used interchangeably, and in the sense of excluding entirely from the provisions of the act the several matters specified. But the author alternates the use of the verbs "interfere" and "prevent" without regard to order or to the appropriate preposition which should follow each. In several instances the verb is omitted entirely, and, in order to make sense, we have to supply one,—and then not the one last used, but the one found in some preceding clause. This is forcibly illustrated by the last clause, relating to wholesale business. This is evidently an independent and general provision, and has no relation to shop-keepers whose place of business is more than one mile from a drug-store. To make any sense out of this, we have to supply the verb "interfere," used back in the first clause of the proviso, which would be about as much of a

liberty with the language of the act as it would be to supply the verb "prevent" in the clause relating to the sale of patent medicines. It is evident, therefore, no construction will make the sentence strictly grammatical, and that its language is so involved and obscure in many respects that we may look to the other provisions of the act, and its general purpose, in order to ascertain the meaning of the legislature in the use of the particular language under consideration. While it is true that, before the courts are called upon to construe, there must be something to be construed,—some ambiguity,—and that, where the words are plain and free from doubt, they require no interpretation, yet the ambiguity may be created by the context as well as by the particular words to be construed. Moreover, the technical rules of grammar are by no means always controlling.

Now, the manifest purpose of the act was to protect the public against the mistakes and ignorance of incompetent and unskilled persons in the preparation and sale of drugs and medicines. The object of such laws is well expressed in the preambles to some similar acts in other states, as, for example: "Whereas, from time to time, unskilled and incompetent persons engage in the compounding and sale of drugs and medicines, to the endangering of the health and life of the public; and, whereas, the persons to whom the preparation and sale of drugs, medicines, and poisons properly belong, known as apothecaries, chemists, and druggists or pharmacists, should possess a practical knowledge of the business and science of pharmacy in all its relations,—therefore, be it enacted," etc. This is the expressed object of the general provisions of this act. They all look to the protection of the health and lives of the public by restricting the business of preparing and dispensing or selling drugs and medicines to those who have the requisite knowledge and skill on the subject. Physicians in prescribing for their patients are, for manifest reasons, excepted from the provisions of the act. The wholesale dealers were also excepted, because they do not sell or dispense medicines directly to those who use them.

Now, it is a matter of common knowledge that what are called "patent" or "proprietary" medicines are prepared ready for immediate use by the public, put up in packages or bottles labelled with the

name, and accompanied with wrappers containing directions for their use, and the conditions for which they are specifics. In this condition they are distributed over the country in large quantities, and sold to consumers in the original packages, just as they are purchased by the dealer, without any other or further preparation or compounding. There is nothing that calls into use any skill or science on the part of the one who sells them. One man can do it just as well as another, if he can read the label on the package and make change with the purchaser. The fact that the seller is a pharmacist, of itself, furnishes no protection to the public. The articles might as well be sold by a grocer or dry-goods merchant. Undoubtedly the state has as much right to regulate the sale of patent medicines as any other; and, in the exercise of that power, may adopt any measures they see fit, provided only they adopt such as would have some tendency to accomplish the desired end, to wit, the protection of the lives and health of the public. This is the extent and limit of their power. But, because it was deemed either impracticable or unnecessary to regulate the sale of patent or proprietary medicines, of the acts of nearly 30 states or territories regulating the practice of pharmacy (all so nearly alike as to suggest a common source) which we have examined, every one, unless ours be an exception, expressly excepts the sale of patent or proprietary medicines from its operation. Probably, the reason is that merely to limit their sale to pharmacists would furnish no protection to the public, without some further regulation as to inspection or analysis that would tend to exclude from sale those that might be injurious to health, or something requiring pharmacists to exercise their skill and science in determining the quality and properties of such as they sold. If we turn to our statute we find an entire absence of any such provisions. On the contrary, we find that the business of manufacturing and making patent medicines (which, in view of the manner they are sold, would seem more important than their sale) is expressly excluded from the operation of the act. Had the act made pharmacists responsible for their quality, this might have had some tendency to protect the public. But in section 13 we find that any such liability is expressly excepted as to those articles or prepara-

tions known as "patent" or "proprietary." It is suggested that the mere fact of limiting the sale to pharmacists would tend to protect the public, because they would be more likely to know the qualities of these patent medicines, and hence less likely to sell those that would be prejudicial to health. But this possibility is too uncertain and attenuated to be entitled to any weight. Men usually conduct business for the money there is in it; and, while it is undoubtedly true that no honest man, whether pharmacist or not, would keep for sale any medicine which he actually knew to be dangerous to life or health, yet, in the absence of any provision of law requiring a pharmacist to exercise his professional skill in ascertaining the properties of those patent medicines which he sells, and with a provision of statute expressly exempting him from liability for their quality, it must be assumed that he would do as all dealers do,—keep on hand and sell whatever the trade called for, without reference to their special merits or demerits. Therefore, in the absence of some other regulations, a statute merely limiting the sale of patent medicines to a particular class would not and could not have any natural or reasonable tendency to protect the public. Such a law would not go far enough to amount to a police regulation. It would be merely giving a certain class of men a monopoly of the trade. This is not within the police power of the state. This power is, no doubt, a very broad one, and, within its legitimate sphere, a very useful one. It is wholly within the discretion of the legislature when to exercise it, and to determine what are the best means to accomplish the desired object. Courts will never assume to determine whether the law is a wise one, or whether the legislature have adopted the best means. Yet there is a limit to this power. A law enacted in the exercise of the police power must in fact be a police law. If it be a law for the protection of public health, it must be a health law having some relation to public health. In this day, when so many selfish and private schemes in the way of securing monopolies and excluding competition in trade are attempted under the mask of sanitary legislation, it may be an important question whether the judiciary are concluded by the mask, or whether they may tear it aside in order to ascertain who is in it. But with this we are not now concerned. It

is, at least, settled that, if it is apparent on the face of the act that its provisions, from their very nature, cannot and will not conduce to any legitimate police purpose, it is the right as well as the duty of the court to pronounce it invalid, as in excess of legislative power and an arbitrary and unwarranted interference with the right of the citizen to pursue any lawful occupation. According to the construction claimed for it, the provision of the act as to the sale of patent or proprietary medicines would be of just this character. It would be giving pharmacists a monopoly of the business, without in any manner protecting public health. It would therefore be void, and, if so, the whole act would fail. A construction that would lead to such a result is to be avoided, if possible. Under these circumstances, we think we are justified, in order to sustain the act, in adopting the other construction, and holding that the clause under consideration was intended to exclude generally from the operation of the act the business of dealing in and selling patent medicines. This would make it in harmony with other provisions of the act, and right in the line of all, or nearly all, similar legislation in other states. This disposes of the first case, as both the articles sold were "patent" or "proprietary."

4. One or two questions remain to be considered in connection with the second case. The articles sold were one bottle of the preparation called "Beef, Iron, and Wine," and one pound of borax. Whether the term "patent and proprietary medicines" is to be understood in a strict and technical sense, as limited to those in the preparation of which there is an exclusive right of property in some proprietor patentee, or whether it is used in a popular and more extended sense, as including all preparations prepared and sold throughout the country in original packages, as patent medicines are, is a question we are not called upon to determine, because the answer admits that "Beef, Iron, and Wine" is not a patent medicine, and that its uses are exclusively medicinal. Its sale was therefore a violation of the law. It nowhere appears that the borax was sold for medicinal purposes. It stands admitted (which is a matter of common knowledge) that, while borax is often used in compounding medicines, and prescribed for medical purposes, yet it is quite as much used in metal-

lurgical operations, and especially in soldering; that it is extensively and generally used for domestic and household purposes; that it is a simple and exceedingly helpful agent, applicable to many of the commonest wants and operations of men, wholly disconnected with physicians' prescriptions or the compounding of medicines. The statute was evidently aimed at articles used as medicines; and, in order to give it a reasonable construction, its application must be confined to those articles whose primary and principal use is medicinal, or what are commonly understood as medicines; or at least, if it is to be extended to any other articles, it must be limited to cases where they are prepared and sold for medicinal purposes. Any other construction would lead to the most absurd consequences. It would restrict to pharmacists the sale of milk, sugar, chalk, charcoal, iron, sulphur, turpentine, camphor, and a thousand other substances that are frequently used medicinally, or, at least, in compounding medicines, but the use of which also enters into the various, commonest, domestic, industrial, or scientific pursuits of mankind.

The result is that the judgment in the first case is wholly reversed, and that in the second case modified by deducting one-half, or $50.