[Criminal No. 655. Filed June 22, 1927.]

[257 Pac. 366.]

STATE, Appellant, v. THOMAS CHILDS and C. C. ROCKWELL, Respondents.

Mr. John W. Murphy, Attorney General, Mr. Earl Anderson, Assistant Attorney General, Mr. George T. Wilson, County Attorney, Messrs. Hayes, Stanford, Laney & Allee, and Messrs. Cunningham & Carson, for the State.

Mr. L. C. McNabb and Mr. L. J. Holzwarth, for Respondents.

LOCKWOOD, J.—Thomas Childs and C. C. Rockwell were informed against for the violation of paragraph 4805, Revised Statutes of Arizona of 1913, Civil Code. The charging part of the information reads as follows:

"The said Thomas Childs and the said C. C. Rockwell on or about the 26th day of August, 1926, and before the filing of this information at and in the county of Maricopa, state of Arizona, being then and there copartners doing business under the firm name and style of Childs & Rockwell, and being then and there the proprietors of and operating and conducting a general store in the town of Gila Bend, county of Maricopa, state of Arizona, in which said store the said Thomas Childs and C. C. Rockwell did then and there maintain and were the owners and proprietors of a drug department, and the said Thomas Childs and C. C. Rockwell did then and there permit the sale and vending of drugs and medicines in its said store at the said Gila Bend, Arizona, in the said drug department thereof, and the said C. C. Rockwell and Thomas Childs did then and there permit one Monwell Mozom, an employee of the said Thomas Childs and C. C. Rockwell, to sell and vend to one E. C. Stults certain drugs, medicines and poisons in said drug department of said store of the said Thomas Childs and C. C. Rockwell, to wit:

1 tube—20 tablets calomel and soda, ½ grain each, Lilly & Company, Mfgrs., Indianapolis, Ind. ...........................30 cts.

1 bottle Emerson's bromo-seltzer, manufactured by Emerson Drug Company, Baltimore, Md. ...........................30 cts.

1 bottle Mexican Oil, manufactured by Hausman Drug Company, Trinidad, Colorado..15 cts.

1 bottle Puritan hydrogen peroxide, manufactured by Brunswig Drug Company, Los Angeles, California .....................25 cts.

1 bottle aromatic Cascara Sagrada, put up by L. Perrigo Company, Allegan, Michigan..25 cts.

1 bottle tincture arnica, put up by L. Perrigo Company, Allegan, Michigan.............25 cts.

1 box boric acid, put up by L. Perrigo Company, Allegan, Michigan.................25 cts.

—lawful money of the United States of America, at retail in the original packages, the said Monwell Mozom not being then and there a registered pharmacist duly and regularly registered under the laws of the State of Arizona, and said drugs, medicines, and poisons so sold, as aforesaid, not then and there being sold within the presence or under the direction or immediate or personal supervision of any registered pharmacist duly registered under the laws of the State of Arizona. . . . ''

A demurrer was interposed which set up substantially that said paragraph 4805, *supra,* was unconstitutional. It was argued, submitted, and by the trial court sustained, and from the sustaining order an appeal was taken by the state.

There is no issue of fact involved, and the real question of law is as to the validity of the statute. The paragraph on which the information is based is a part of title 48, chapter 5, Civil Code of 1913, ordinarily known as the Pharmacy Act. This chapter regulates in detail the practice of pharmacy and the manufacture, compounding, and selling of drugs, medicines, and poisons. Paragraph 4805 thereof reads as follows:

"4805. Any proprietor of a pharmacy or store which maintains a drug department who shall fail, or neglect to place in charge of such pharmacy or drug department a registered pharmacist, or any such proprietor who shall, by himself or any other person, permit the compounding of prescriptions, or the vending of drugs, medicines, or poisons, in his or her store, or place of business, except by or in the presence and under the direct, immediate and personal supervision of, a registered pharmacist, shall be guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not less than twenty dollars nor more than one hundred dollars or by imprisonment for a term of not more than fifty days, or by both such fine and imprisonment."

It was the contention of defendant in the lower court, and is his position here, that the act, in so far as it attempts to confine to registered pharmacists the right to sell what are known as "patent" or "proprietary" remedies and drugs and medicines sold in the original packages of the manufacturer, violates section 4, article 2, and subdivision 13, section 19, part 2, of article 4 of the Constitution of Arizona. These provisions read, respectively, as follows:

"Section 4. No person shall be deprived of life, liberty, or property without due process of law."

"Article IV. . . .

"Section 19. No local or special laws shall be enacted in any of the following cases, that is to say: . . .

"13. Granting to any corporation, association, or individual, any special or exclusive privileges, immunities, or franchises."

The question thus presented is of considerable importance to the state, and we have gone most carefully into the authorities cited by both parties. There are certain general propositions on which they are in substantial agreement. It is contended by the state and admitted frankly by defendants that for the

preservation of the public health and safety the state may regulate and place proper restrictions upon the practice of pharmacy, and may prescribe qualifications to be possessed by those engaged in it; that in the exercise of its police power it may regulate the sale of drugs, medicines and poisons, where such regulation in any way reasonably tends to protect the public health, safety or morals. It is, however, insisted by defendants that such regulation must be of a reasonable nature, and calculated in some way to promote such protection, and that the particular paragraph in question, if construed to prohibit any person except a registered pharmacist from selling patent or proprietary medicines or those in the original package of the manufacturer, does not in the slightest degree protect the public, but grants a monopoly of a business recognized by the state as legitimate to one class of persons, without any legitimate reason therefor. We think the general rule contended for by defendants, to the effect that a statute allowing one class of persons to engage in what is presumptively a legitimate business, while denying such right to others, must be based upon some principle which may reasonably promote the public health, safety or welfare, that unless it does so in some degree it is unconstitutional, and that while every presumption is in favor of the validity of a statute, yet when it clearly appears that on no reasonable theory could such a one contribute to the public health or safety it is the duty of the courts to so declare and to set it aside as unconstitutional, is well taken. *Lawton* v. *Steele,* 152 U. S. 133, 38 L. Ed. 385, 14 Sup. Ct. Rep. 499; *Dobbins* v. *Los Angeles,* 195 U. S. 223, 49 L. Ed. 169, 25 Sup. Ct. Rep. 18; *Ex parte Whitewell,* 98 Cal. 78, 35 Am. St. Rep. 152, 19 L. R. A. 727, 32 Pac. 870; 12 C. J. 930.

Let us then examine the statute with this general rule as the test of its validity. There are certain

other provisions of the Pharmacy Act which will assist us in determining this question. Paragraph 4803, Revised Statutes of Arizona of 1913, Civil Code, reads as follows:

"Every proprietor or manager of a pharmacy or drug store shall be held responsible for the quality of all drugs, chemicals and medicines sold or dispensed by him, except those sold in the original package of the manufacturer and except those articles or preparations known as patent or proprietary medicines. . . . "

And paragraph 4807 is in the following language:

"The board of pharmacy shall issue a permit to general dealers in rural districts in which the conditions, in their judgment, do not justify the employment of a registered pharmacist, and where the store of such general dealer, is not less than three miles distant from the store of a registered pharmacist, which permit shall authorize the person or firm named therein to sell in such locality, but not elsewhere, and under such restrictions and regulations as said board may from time to time adopt, the following simple household remedies and drugs, and any other, in such manner and form as may be hereafter authorized by said board, as follows, to wit:

"Tincture of arnica, spirits of camphor, almond oil, distilled extract witch-hazel, syrup of ipecac, syrup of rhubarb, hive syrup, sweet spirits of nitre, tincture of iron, epsom salts, rochelle salts, senna leaves, carbonate of magnesia, seidlitz powders, quinine, cathartic pills, camomile flowers, caraway seed, chlorate of potash, moth balls, plasters, salves, ointments, peroxide of hydrogen, copperas, gum camphor, asafoetida, saffron, anise seed, saltpeter.

"The board shall charge in advance an annual fee of one dollar for such permit, and it shall be unlawful for any dealer to sell any drugs or ordinary household remedies without complying with the requirements of this section. Whenever a registered pharmacist shall establish a pharmacy within one mile by the shortest road from the place of business of such general dealer, no further license shall be

granted, and the license already issued shall be void; provided, that the following drugs, medicines, and chemicals may be sold by grocers and general dealers without restriction, viz.:

"Glauber salts, vaseline, turpentine, condition powders, cream of tartar, carbonate of soda, bay rum, essence of peppermint, ammonia, alum, castor oil, bicarbonate of soda, chloride of lime, glycerine, witch-hazel, sheep dip, borax, sulphur, blue stone, flaxseed, insect powder, fly paper, when prepared and labeled with the official poison labels."

Read in connection with paragraph 4805, *supra,* it appears therefrom, in substance, that no person except a registered pharmacist or someone under his immediate supervision may sell drugs, medicines and poisons except of a very limited nature, with the proviso that the state board of pharmacy may issue a permit for the sale of drugs and medicines specified by them if no pharmacist lives in the community. When, however, one establishes himself there, he is given a monoply of the sale of all medicines except a very closely restricted list, and all other persons who had previously been engaged in the selling of drugs by virtue of a permit from the board of pharmacy must immediately cease such sales. No duty is imposed on the pharmacist in regard to the sale of drugs, chemicals or medicines in the original packages of the manufacturer, or what are known as "patent" or "proprietary" remedies, which cannot be performed as well by any intelligent person, but the statute, on the contrary, expressly exempts him from any responsibility as to their character and quality.

Pharmacy statutes have been before the courts in many states. In most cases, while limiting the compounding of prescriptions to regular pharmacists, they expressly provide that the pharmacy acts shall not prohibit the sale of patent or proprietary remedies or drugs in the original packages of the manu-

facturer by ordinary persons. There are, however, some states in which the statute on this point is substantially like ours, and we have two distinct and contradictory lines of decision upon this point. Sustaining such laws are the Supreme Courts of Wisconsin, Iowa, New York, and possibly Missouri. *Hildreth* v. *Crawford,* 65 Iowa 339, 21 N. W. 667; *State* v. *Heinemann,* 80 Wis. 253, 27 Am. St. Rep. 34, 49 N. W. 818; *State* v. *Hamlett,* 212 Mo. 80, 110 S. W. 1082; *State Board* v. *Matthews,* 197 N. Y. 353, 26 L. R. A. (N. S.) 1013, 90 N. E. 966.

On the other side of the question the leading cases are *State* v. *Donaldson,* 41 Minn. 74, 42 N. W. 781, and *Noel* v. *People,* 187 Ill. 587, 79 Am. St. Rep. 238, 52 L. R. A. 287, 58 N. E. 616.

Counsel for defendant and for the state have cited a number of other cases to us in their briefs. We have examined them carefully, but consider they are applicable only to general principles which are conceded by both parties, or else do not affect the vital issue herein. The case of *Baccus* v. *State,* 232 U. S. 334, 58 L. Ed. 627, 34 Sup. Ct. Rep. 439, for example, so strongly relied on by the state, when read in connection with *Emert* v. *State,* 156 U. S. 296, 39 L. Ed. 430, 15 Sup. Ct. Rep. 367, cited therein, shows clearly that the court based its opinion in both cases on the right of a state to license and regulate hawkers and peddlers, a matter involving principles very different from those controlling the case at bar. The best reasoned opinion sustaining acts of this kind is *State Board* v. *Matthews, supra,* wherein the court says:

"As has already been suggested, there are strong reasons relative to the public welfare which make it proper that regulations concerning the sale of drugs and medicines should not be confined to poisons, but may be extended so as to embrace what are known as harmless household remedies—that is, which may be harmless if properly prepared. *The injury to the public health which might ensue if such medicines*

*were carelessly or ignorantly compounded so as to contain deleterious ingredients or deceptively, so as to be something different from what they purported to be, is manifest.* The police power logically extends to such medicines no less than to poisons and other lethal medicinal agents."

It will be seen on examining the language of the court carefully that the real basis of its decision, so far as remedies of the class in question are concerned, is contained in the italicized portion of the above quotation. With this language we are heartily in accord. If our statute applied only to the sale of medicines, whether they were the most virulent poisons or classed as what are commonly called household remedies, which were compounded by the vendor, or those for whose purity, character, and use he was personally responsible, it would, indeed, be obvious that the health and safety of the public would be protected by providing that only one trained for the purpose would be permitted to compound such remedies or to guarantee their character and value. Our statute, however, in the first place, expressly provides that the vendor does not guarantee or become responsible for the quality of drugs of the kind involved in this case, nor is it limited to those which he himself prepares or compounds. The reasons of the cases supporting the contrary view are well expressed in *State* v. *Donaldson, supra.* Therein the court says:

"Now, the manifest purpose of the act was to protect the public against the mistakes and ignorance of incompetent and unskilled persons in the preparation and sale of drugs and medicines. The object of such laws is well expressed in the preambles to some similar acts in other states, as, for example: 'Whereas, from time to time, unskilled and incompetent persons engage in the compounding and sale of drugs and medicines, to the endangering of the health and life of the public; and, whereas, the persons to

whom the preparation and sale of drugs, medicines, and poisons properly belong, known as apothecaries, chemists, and druggists or pharmacists, should possess a practical knowledge of the business and science of pharmacy in all its relations—therefore, be it enacted,' etc. This is the expressed object of the general provisions of this act. They all look to the protection of the health and lives of the public by restricting the business of preparing and dispensing or selling drugs and medicines to those who have the requisite knowledge and skill on the subject. Physicians in prescribing for their patients are, for manifest reasons, excepted from the provisions of the act. The wholesale dealers were also excepted, because they do not sell or dispense medicines directly to those who use them.

"Now, it is a matter of common knowledge that what are called 'patent' or 'proprietary' medicines are prepared ready for immediate use by the public, put up in packages or bottles labeled with the name, and accompanied with wrappers containing directions for their use, and the conditions for which they are specifics. In this condition they are distributed over the country in large quantities, and sold to consumers in the original packages, just as they are purchased by the dealer, without any other or further preparation or compounding. There is nothing that calls into use any skill or science on the part of the one who sells them. One man can do it just as well as another, if he can read the label on the package and make change with the purchaser. The fact that the seller is a pharmacist, of itself, furnishes no protection to the public. The articles might as well be sold by a grocer or dry goods merchant. Undoubtedly the state has as much right to regulate the sale of patent medicines as any other; and, in the exercise of that power, may adopt any measures they see fit, provided only they adopt such as would have some tendency to accomplish the desired end, to wit, the protection of the lives and health of the public. This is the extent and limit of their power. But, because it was deemed either impracticable or unnecessary to regulate the sale of patent or proprietary medicines, of the acts of nearly 30 states or territories regulat-

ing the practice of pharmacy (all so nearly alike as to suggest a common source) which we have examined, every one, unless ours be an exception, expressly excepts the sale of patent or proprietary medicines from its operation. Probably, the reason is that merely to limit their sale to pharmacists would furnish no protection to the public, without some further regulations as to inspection or analysis that would tend to exclude from sale those that might be injurious to health, or something requiring pharmacists to exercise their skill and science in determining the quality and properties of such as they sold. If we turn to our statute we find an entire absence of any such provisions. On the contrary, we find that the business of manufacturing and making patent medicines (which, in view of the manner they are sold, would seem more important than their sale) is expressly excluded from the operation of the act. Had the act made pharmacists responsible for their quality, this might have had some tendency to protect the public. But in section 13 [Laws 1885, c. 147] we find that any such liability is expressly excepted as to those articles or preparations known as 'patent' or 'proprietary.' It is suggested that the mere fact of limiting the sale to pharmacists would tend to protect the public, because they would be more likely to know the qualities of these patent medicines, and hence less likely to sell those that would be prejudicial to health. But this possibility is too uncertain and attenuated to be entitled to any weight. Men usually conduct business for the money there is in it; and, while it is undoubtedly true that no honest man, whether pharmacist or not, would keep for sale any medicine which he actually knew to be dangerous to life or health, yet, in the absence of any provision of law requiring a pharmacist to exercise his professional skill in ascertaining the properties of those patent medicines which he sells, and with a provision of statute expressly exempting him from liability for their quality, it must be assumed that he would do as all dealers do—keep on hand and sell whatever the trade called for, without reference to their special merits or demerits. Therefore, in the absence of some other regulations, a

statute merely limiting the sale of patent medicines to a particular class would not and could not have any natural or reasonable tendency to protect the public. Such a law would not go far enough to amount to a police regulation. It would be merely giving a certain class of men a monopoly of the trade. This is not within the police power of the state. This power is, no doubt, a very broad one, and, within its legitimate sphere, a very useful one. It is wholly within the discretion of the Legislature when to exercise it, and to determine what are the best means to accomplish the desired object. Courts will never assume to determine whether the law is a wise one, or whether the Legislature have adopted the best means. Yet there is a limit to this power. A law enacted in the exercise of the police power must, in fact, be a police law. If it be a law for the protection of public health, it must be a health law having some relation to public health. In this day, when so many selfish and private schemes in the way of securing monopolies and excluding competition in trade are attempted under the mask of sanitary legislation, it may be an important question whether the judiciary are concluded by the mask, or whether they may tear it aside in order to ascertain who is in it. But with this we are not now concerned. It is, at least, settled that, if it is apparent on the face of the act that its provisions, from their very nature, cannot and will not conduce to any legitimate police purpose, it is the right as well as the duty of the court to pronounce it invalid, as in excess of legislative power and an arbitrary and unwarranted interference with the right of the citizen to pursue any lawful occupation. According to the construction claimed for it, the provision of the act as to the sale of patent or proprietary medicines would be of just this character. It would be giving pharmacists a monopoly of the business, without in any manner protecting public health. . . . ''

We think on comparing the two opinions the logic of the Donaldson case is unanswerable, and that a statute prohibiting the sale of drugs, medicines or poisons when sold in the original package of the

manufacturer or of a character known as "patent" or "proprietary" medicines by any person except a registered pharmacist, and imposing no restrictions on the sale or duties on the seller which might reasonably indicate the prohibition was in the interest of the public, violates the provisions of subdivision 13, section 19, article 4, of the Constitution, and is so far unconstitutional and void.

We do not wish it to be understood that we hold the power of the legislature to legislate in regard to the sale of drugs, medicines or poisons is denied. On the contrary, we think all reasonable provisions protecting the health and safety of the public by regulating the prescribing, compounding and dispensing of such articles are highly commendable and should be encouraged, but when an attempted regulation on its face apparently has no effect except to grant a monopoly of the sale of certain articles to a special class under conditions which can in no manner benefit the public, such regulation cannot be sustained.

We therefore hold that, in so far as section 4805, *supra,* attempts to prohibit the vending of drugs, medicines or poisons in the original package of the manufacturer or of patent or proprietary medicines, by persons who are not registered pharmacists, and for no other reason than that they are not such, it is unconstitutional. The order of the superior court of Maricopa county sustaining the demurrer to the information is affirmed.

ROSS, C. J., and McALISTER, J., concur.