34 Cal.App.2d Supp. 755 (1939)
THE PEOPLE, Respondent,
v.
N. C. HERON, Appellant.
California Court of Appeals. 
April 28, 1939.
 Edward J. Cotter for Appellant. [34 Cal.App.2d Supp. 757]
 Ray L. Chesebro, City Attorney, W. Jos. McFarland, Assistant City Attorney, and John L. Bland, Deputy City Attorney, for Respondent.
 Bishop, J.
 Appellant was convicted and sentenced on the charge that he, not being a registered pharmacist or assistant pharmacist, had sold a drug, to wit, eucalyptus oil. Of the truth of the charge there is no question; admittedly, the appellant sold a bottle of eucalyptus oil, which was a drug, and he was neither a registered pharmacist nor a registered assistant pharmacist. The provisions of section 4030 of our Business and Professions Code were thus plainly violated unless the article sold falls within the saving words of section 4032 of the same code. These two sections, both found in chapter 9 of the code, read:
 Section 4030. "Except as otherwise provided in this chapter, it is unlawful for any person to manufacture, compound, sell or dispense any drug, poison, medicine or chemical, or to dispense or compound any prescription of a medical practitioner, unless he is a registered pharmacist or a registered assistant pharmacist under the provisions of this chapter."
 Section 4032. "This chapter does not apply to registered, trade-marked or copyrighted proprietary medicines, registered in the United States Patent Office, but it does apply to the sale by or through any mechanical device of drugs, medicines and proprietary medicines registered or trade-marked in the United States Patent Office."
 We are of the opinion that the evidence permits of no conclusion other than that the eucalyptus oil that appellant sold was a proprietary medicine, the trade mark of which was registered in the United States Patent Office, and that as a consequence the judgment must be reversed.
 [1] In employing in section 4032 the words "registered, trade-marked or copyrighted proprietary medicines, registered in the United States Patent Office", to denote medicines that could be sold by persons not registered either as pharmacists or assistant pharmacists, the legislature made a choice of words which was not a happy one; they cannot be given a literal interpretation without robbing them of effect, for medicines, proprietary or not, may not be registered in the United States patent office, nor may they be trade marked or [34 Cal.App.2d Supp. 758] copyrighted. It is in such cases as these that the courts are compelled to engage in a type of construction of language which is sometimes termed judicial legislation. "The courts, with due regard to the prerogatives of a coordinate branch of government, approach this duty with caution, and with a proper appreciation of the distribution of the powers of government. But statutes of doubtful meaning must be interpreted ... in event of controversy as to their true meaning, by the courts established by the organic law for that purpose." In re Sekuguchi, (1932) 123 Cal.App. 537, 540 [11 PaCal.2d 655].) Earlier in the same case it was stated (p. 538), "When it is necessary to effectuate the legislative intent, it is equally clear that words or phrases may be changed, added, or stricken out. (23 Cal.Jur. 237.)" Of an early addition to the Penal Code which, taken literally, was meaningless ("robbing a train") our Supreme Court said in People v. Lovren, (1897) 119 Cal. 88, 90 [51 P. 22, 638]: "It certainly was the creation of an amateurish legislative hand, yet at the same time courts are required to sustain it if possible."
 We have no doubt that the legislature intended to exempt from the operation of chapter 9 of the Business and Professions Code, in addition to others not involved in this case, those proprietary medicines that are sold in containers bearing the trade mark of the manufacturer of the medicine, if the trade mark is, as it may be (sec. 81, Title 15, United States Code Annotated) registered in the United States patent office. [2] The medicine which appellant sold was clearly within the exception, if it was proprietary, for its container bore appellant's trade mark, which he had registered in the United States patent office. This leaves only one question: was it a proprietary medicine? It appears without contradiction that it was of his own manufacture and was labeled and sold as Heron's Pure Eucalyptus Oil and that he had been manufacturing and selling, wholesale and retail, since 1895, the remedies known as Heron's Pure Eucalyptus Oils. Appellant claimed that he alone of all mortals knew how to make pure eucalyptus oil. The process, which he claimed was his secret, he declined to divulge, and it may well be that the trial court was warranted in disregarding, as insufficiently based, appellant's claim that he alone knew how to make the product which he sold. But even if this be so, and there be [34 Cal.App.2d Supp. 759] others on this planet who know how to manufacture a product just like appellant's, we are nevertheless of the opinion that Heron's Pure Eucalyptus Oil, which he was found guilty of selling, is a proprietary medicine.
 The first act regulating the practice of pharmacy for this state was adopted in 1891 (Stats. 1891, p. 86.) In section 11 we find this provision: "Nor shall general dealers come under the provisions of this Act, in so far as it relates to the keeping for sale of proprietary medicines in original packages of drugs and medicines." In 1901 a new act was passed (Stats. 1901, p. 299) in general scope quite similar to the 1891 act, which it supplanted, but expressing the exception with which we are concerned in this language (sec. 11): "Nor shall this act apply to registered or copyrighted proprietary medicines registered in the United States patent office, nor to the manufacture of proprietary remedies or the sale of the same in original packages by persons other than pharmacists."
 Again in 1905 (Stats. 1905, p. 535) a new act took the place of the old, but the language just quoted reappeared almost without change. At the next session of the legislature (Stats. 1907, p. 768) for the first time the group of words appear as we now have them, "registered, trade-marked or copyrighted proprietary medicines, registered in the United States patent office", the adjective "trade-marked" being added. In the 1905 act we find this further provision, in section 11: "Every proprietor or manager of a pharmacy or drugstore shall be held responsible for the quality of all drugs, chemicals and medicines sold or dispensed by him, except those sold in the original package of the manufacturer, and except those articles or preparations known as patent or proprietary medicines. ..."
 [3] We have traced the legislative development of the provision excepting proprietary medicines from the operation of chapter 9 of the Business and Professions Code to show that the term "proprietary medicines" is not new to that chapter, but rather that it dates back to 1891. By the adding of adjectives and the omission of a phrase, the legislature has varied from time to time the scope of the provision exempting proprietary medicines from the operation of the statutes regulating the practice of pharmacy, but apparently the words "proprietary medicines" have been used in the same meaning throughout the several acts, and as now used should [34 Cal.App.2d Supp. 760] be given the same meaning as that which they had in the early statutes. (People v. Moss, (1939) 33 Cal.App.2d Supp. 763 [87 PaCal.2d 932]; and see People v. Fowler, (1938) 32 Cal.App.2d Supp. 737 [84 PaCal.2d 326].)
 An instructive framing of the real question remaining before us is found in State v. Donaldson, (1889) 41 Minn. 74 [42 N.W. 781, 784], in these words: "Whether the term 'patent and proprietary medicines' is to be understood in a strict and technical sense, as limited to those in the preparation of which there is an exclusive right of property in some proprietor ... or whether it is used in a popular and more extended sense, as including all preparations prepared and sold throughout the country in original packages, as patent medicines are." [4] Strictly speaking, one may say that a patent medicine is only one which is protected by a patent. Also, it is possible to say a proprietary medicine is only one which is protected by a patent, for in no other way does a "proprietor" secure an exclusive right of property in its manufacture. But, and of this we take judicial notice, People v. Silva, (1924) 67 Cal.App. 351, 357 [227 P. 976]; People v. Garcia, (1934) 1 Cal.App.2d Supp. 761, 765 [32 PaCal.2d 445], in the period between 1890 and 1910, even more than today, a preparation was commonly known as a patent or proprietary medicine, dependent not on the fact that it was protected by a patent, nor on the fact that, thanks to a secret imparted by an Indian chief or obtained by years of laboratory research, its maker actually had a secret formula or process,--though in such cases the medicine would doubtless be proprietary--but on the dress in which it was offered to the public. Protected by no patent, and even though others might actually be manufacturing the same article, a medicine was commonly referred to as a patent or proprietary medicine if its proprietor gave it a trade name, or his name, offered it to the public as his product, put it up in a distinctive container, and expressly or impliedly claimed special virtue for it because of the special formula, skill or care which went into its manufacture.
 As one out of several, similar, possible illustrations of the meaning with which the words "patent medicines" were commonly used in the early years of this century, we refer to an article in the July, 1906, issue of "The Review of Reviews". In this article, entitled "The So-Called 'Patent-Medicine' [34 Cal.App.2d Supp. 761] Evil", the adjectives "patent" and "proprietary" are used interchangeably, and it is evident throughout that the medicines under discussion are not limited to those actually patented or actually made by a secret process or from a secret formula.
 The early case of State v. Donaldson, supra, 41 Minn. 74 [42 N.W. 781], affords further proof of the common use of the terms we are considering in this quotation: "Now, it is a matter of common knowledge that what are called 'patent' or 'proprietary' medicines are prepared ready for immediate use by the public, put up in packages or bottles labeled with the name, and accompanied with wrappers containing directions for their use, and the conditions for which they are specifics."
 In Riggs v. City of Hot Springs, (1930) 181 Ark. 377 [26 S.W. (2d) 70], we find a further recognition that the terms we have been considering were in common use. The issue in the case was whether or not appellant was subject to an occupation tax imposed on the manufacturer of patent medicines. Appellant claimed that he was not subject to the tax because, while he assembled herbs and made medicine by a secret process, he was not protected by a patent. After determining that the term "patent medicine" was no longer limited to medicines which were protected by a patent, but that "patent medicines" and "proprietary medicines" were now interchangeable terms, the Arkansas Supreme Court went on to say, having in mind appellant's claim to a secret process: "where any article intended to be used for medicinal purposes is prepared from a secret formula and is placed in containers, either packages or bottles, for sale, to be used without further preparation, and is labeled so that it may be for immediate use, it is a matter of common knowledge that such remedies are called 'patent' or 'proprietary' medicines".
 We are, furthermore, of the opinion that the term "proprietary medicines", as used throughout the legislation respecting the practice of pharmacy, has been used not in a technical but in the commonly accepted sense already stated by us. It seems apparent from the words found in section 11 of the Pharmacy Act of 1905, "those articles or preparations known as patent or proprietary medicines", that the legislature thought that the terms were commonly known and intended to employ them in the sense in which they were generally [34 Cal.App.2d Supp. 762] used. Our statutes governing the practice of pharmacy parallel in substance so closely those found in other states that the meaning in which the words "proprietary medicines" are used by the appellate courts of sister states is particularly helpful. In this connection this further quotation from State v. Donaldson, supra, 41 Minn. 74 [42 N.W. 781], is of interest: "But, because it was deemed either impractical or unnecessary to regulate the sale of patent or proprietary medicines, of the acts of nearly 30 states or territories regulating the practice of pharmacy (all so nearly alike as to suggest a common source) which we have examined, every one, unless ours be an exception, expressly excepts the sale of patent or proprietary medicines from its operation." As the Supreme Courts of the several states construe their respective pharmacy acts, cut by the common pattern, they regard the words "proprietary medicines" as having a general, not a technical meaning; these decisions do not make sense on any other basis.
 In Noel v. People, (1900) 187 Ill. 587 [58 N.E. 616, 79 Am.St.Rep. 238, 52 L.R.A. 287], a person in the employ of the defendant had sold a package of "concentrated Compound Extract of Vitae-Ore Elixir". From the statement of facts, we gather that the defendant took a "kind of iron ore", which "becomes disintegrated or slacked" when exposed to the air for a long period, and which if put in water "makes an agreeable, subacid drink, which possesses, or is claimed to possess, valuable medicinal qualities". It was one of the "remedies" thus prepared which the defendant's employee, not a registered pharmacist, had sold. Without a discussion of the matter this was assumed to be a patent or proprietary medicine, and that assumption was necessary to one of the grounds on which the reversal of the judgment imposing a penalty on the defendant was based. That ground was that a statute which excepted from its terms the sale of patent and proprietary medicines only in villages and some other places not involved in the case, but otherwise prohibited their sale at retail by those not registered pharmacists, was unconstitutional, because the only justification for the control of the sale of medicines was the public welfare, and the public welfare was in nowise furthered by giving registered pharmacists a monopoly of the sale of patent and proprietary medicines. In support of the proposition that the public [34 Cal.App.2d Supp. 763] welfare would not thereby be furthered, the Illinois Supreme Court pointed out that the act placed no duty on the pharmacist with respect to the sale of patent or proprietary medicines, and made this, among other, quotations from State v. Donaldson, supra, 41 Minn. 74 [42 N.W. 781], with reference to patent and proprietary medicines: "There is nothing that calls into use any skill or science on the part of the one who sells them. One man can do it just as well as another." So the Minnesota Supreme Court held that a provision of its pharmacy act which it characterized as "grammatically a jumble" should be construed as excepting from its operation patent and proprietary medicines, and the Illinois Supreme Court held its pharmacy act to be unconstitutional because it failed to except them.
 A Vitae-ore product is again involved in Kentucky Board of Pharmacy v. Cassidy, (1903) 115 Ky. 690 [74 S.W. 730], and again we have a case where the problem is whether the statute meant to except from its provisions "proprietary or patent medicines in original packages". The same answer was made in this case as in the Minnesota case just referred to, and on the same premise governing that case and the Illinois case, that is, the manner in which proprietary and patent medicines are sold gives no excuse for including them in a provision that only registered pharmacists may sell them.
 It would add quite unnecessarily to the number of printed pages in the field of law to quote extensively here from these three cases. A reading of them makes clear that in the solution of their respective problems they had a common understanding of what was meant by patent or proprietary medicine, and that the idea of limiting the terms to such medicines as were actually protected by patents or were in the strictest sense proprietary in that the manufacturers alone knew how to make them, was far from their thoughts. The method of sale makes an attempt to safeguard the public's interest futile or unnecessary.
 Two more recent cases have held their pharmacy laws unconstitutional because they failed to except the sale of proprietary medicines. Watkins Lax-Tone was the subject of the sale that gave rise to State v. Wood, (1927) 51 S. D. 485 [215 N.W. 487, 54 A.L.R. 719], while it was Emerson's Bromo-Seltzer, among other articles, that had been sold in [34 Cal.App.2d Supp. 764] State v. Childs, (1927) 32 Ariz. 222 [257 P. 366, 54 A.L.R. 736]. In these cases, as in those previously cited, the reason for the conclusion reached was based on a concept of proprietary medicine wherein the method of sale and not the method whereby the manufacturer was protected in his "proprietary" interest, was the significant thing. See, also, State v. Geest, (1929) 118 Neb. 562 [225 N.W. 709], and State v. Stephens, (1936) 102 Mont. 414 [59 PaCal.2d 54], and its review of the cases.
 That the constitutional question decided by these cases would probably be given a different answer by our Supreme Court, in view of Ex parte Gray, (1929) 206 Cal. 497 [274 P. 974], does not weaken their value on the question we are considering, which is whether "proprietary medicine" is to be understood in a technical or a general sense.
 Two further cases shed a little light on our problem. In West v. Emanuel, (1901) 198 Pa. 180 [47 Atl. 965, 53 L.R.A. 329], Kohler-Headache Powders were stated to be "a patent or proprietary medicine, manufactured by Kohler", largely, we infer from the opinion, on the strength of the court's judicial knowledge that they had been in demand at least 12 or 15 years and on sale in most if not all of the principal drug stores. Be that as it may, the existence of a patent or a secret formula was not mentioned.
 In Tiedje v. Haney, (1931) 184 Minn. 569, 613 [239 N.W. 611], we have this qualified approval of the conclusion which we have reached: "The word proprietary, as applied to medicines, necessarily implies that the medicine has been compounded by a manufacturer who prepared the medicine according to his own formula, (State v. Kendig, 133 Iowa, 164 [110 N.W. 463]) though probably it is not necessary that the formula should be the exclusive property of the maker, or that the process be secret. It may have a character of its own according to the reputation of the manufacturer and the nicety with which it is prepared."
 The question which we have been considering has not been answered alike by all courts which have considered it. This court, in the case of People v. McClain, (1934) 2 Cal.App.2d Supp. 751 [33 PaCal.2d 710], gave an answer which we now think to be too restricted, and in doing so cited and relied upon the several decisions which place, we believe, too much weight on what the adjectives "proprietary" and [34 Cal.App.2d Supp. 765] "patent" denote, without recognizing the broader meaning that had come to be given to the combination of those adjectives with the word "medicines" than they have alone or in combination with such nouns as "shoes".
 For the reasons given, the judgment should be, and it is, reversed, with directions to the trial court to dismiss the complaint and exonerate the bail of the appellant.
 Schauer, J., concurred.
 Shaw, P. J.,
 Concurring.
 I concur. Upon further consideration of the question in the light of the decisions from other jurisdictions and other matters affecting it, I have concluded that the definition given the term "proprietary medicine" in People v. McClain, (1934) 2 Cal.App.2d Supp. 751, 756 [33 PaCal.2d 710], is too limited, and I agree to that stated in the main opinion herein, which is substantially the "more extended sense" referred to in State v. Donaldson, therein quoted. It seems that Ferguson v. Arthur, (1885) 117 U.S. 482 [6 S.Ct. 861, 29 L.Ed. 979], cited and relied on in the McClain case, does not go quite so far as there supposed, for in the opinion in Ferguson v. Arthur, appear the following statements: "It is quite plain, we think, that Thomas and William Henry recommended their calcined magnesia to the public as a medicine in which they had a proprietary right, as owning all that there was of good will and business reputation appurtenant to the article resulting from its name and from what they stated about its manufacture." (P. 487); "Thus a medicinal preparation might be proprietary, without being made by a private formula, or under an exclusive right claimed to the making or preparing it, or under a patent." (P. 488.)
 In reaching my present conclusion, I am also moved somewhat by the lack of apparent reason for making a distinction between those medicines covered by the definition stated in the McClain case and those outside of it but within the definition here adopted. As forcefully urged here in argument of another case, the result of the definition in the Mcclain case is that a medicine which is patented or is made by some secret formula or exclusive process may be sold by anyone, but after the patent has expired or the formula has been discovered or the process made public, so that other [34 Cal.App.2d Supp. 766] persons than the original manufacturer may and do make the medicine, it is no longer proprietary and may be sold only by registered pharmacists or assistants. Thus a new medicine, of whose composition and effect little or nothing is publicly known, may be sold without restriction, but the sale of the same medicine, made by the same manufacturer, after it does become publicly known is restricted. No good reason appears for such a distinction, and In re Gray, (1929) 206 Cal. 497 [274 P. 974], while upholding the limitation made by the act on the sale of original package medicines not proprietary, does not deal with this distinction or suggest any good reason for it, nor does it put any construction on the term "proprietary medicine".
 It also appears that the definition stated in the McClain case is difficult of application, by reason of its requirement that a proprietary medicine must have "exceptional virtues ... as distinguished from other preparations of the same sort". Other cases involving the same statute have come up to us on appeal since the McClain case, and in each of them the trial court has been obliged to make inquiry into this matter of exceptional virtues, and thereon to hear testimony reading much like the ballyhoo of the salesmen of proprietary medicines in their palmiest days. When even the courts with unlimited time at their disposal, have difficulty in ascertaining the fact in such a matter, the ordinary merchant desiring to know whether he may sell an article is presented with a practically insoluble question, whose correct answer he must guess on penalty of criminal liability if he errs. The rule now adopted makes it possible to determine on examination of the article whether it may be sold, and should present no greater problems in compliance with it than may reasonably be thrust upon a citizen desiring to be law-abiding.