Reid S. Moule, J.
This is a motion by the defendants for summary judgment. The plaintiff also seeks summary judgment (Rules Civ. Prac., rule 113).
There appear to be no substantial questions of fact presented by the pleadings other than that the amended complaint alleges in paragraphs Tenth and Twelfth that Bayer Aspirin Tablets are not poisonous, deleterious and/or habit-forming within the meaning of section 6816 (subd. 2, par. e) of the Education Law. These allegations are put in issue by the answer but the defendants have not supported the denials by affidavits containing evidentiary facts as is required on such a motion (Shapiro v. Health Ins. Plan, 7 N Y 2d 56, 62; O’Meara Co. v. National Park Bank, 239 N. Y. 386, 395; Farrell v. Shelby Mut. Ins. Co., 18 Misc *133 2d 459, 461). Moreover, counsel for the defendants on the argument of these motions stated three times that for the purposes of the motions no claim was made that Bayer Aspirin Tablets are a harmful remedy. These admissions are binding upon the defendants for they were made to avoid “ some question arising on the pleadings ” (Gracie Square Realty Corp. v. Choice Realty Corp., 305 N. Y. 271, 278; Lloyd v. R. S. N. Corp., 251 N. Y. 318, 320).
The action is brought for a judgment declaring that the plaintiff has the right to continue to sell Bayer Aspirin Tablets without first obtaining for its retail establishments registration certificates from the defendant, New York State Board of Pharmacy, and the right to make such sales through its employees who have not been issued licenses as pharmacists by the Board of Pharmacy or through employees who are not acting under the supervision of persons so licensed. Plaintiff also seeks a permanent injunction to restrain the defendants from proceeding against the plaintiff in any way which would interfere with its sale of Bayer Aspirin Tablets and from instituting any proceeding against the plaintiff under subdivision 2 of section 6823 of the Education Law.
In brief, the question here is the right of the plaintiff to sell prepackaged Bayer Aspirin Tablets in its chain of supermarkets in the State of New York without holding registration certificates issued by the Board of Pharmacy and through its unlicensed employees.
Though other questions are presented which will be discussed, the two principal questions are: first, whether Bayer Aspirin Tablets are a ‘ ‘ proprietary medicine ’ ’ not poisonous, deleterious or habit-forming (Education Law, § 6816, subd. 2, par. c), and second, if the Bayer Aspirin Tablets are held not to be a proprietary medicine, whether the statutory provisions relied upon by the defendants as prohibiting the sale of the product in plaintiff’s supermarkets are constitutional.
The defendants rely in support of their position on provisions of the Education Law. Subdivision 1 of section 6805 of that law provides that except as prescribed in article 137, entitled “ Pharmacy”, it shall be unlawful for any person to practice as a pharmacist, druggist, apprentice or storekeeper or to engage in dispensing drugs at retail within the State and that every place in which drugs are possessed for the purpose of dispensing at retail “ shall be a pharmacy, a drug store, or a registered store ’ ’ and that no pharmacy, drugstore or registered store shall operate as such “ until the proprietor has applied for and received a registration certificate from the board ”.
*134 The term ‘ ‘ drugs ’ ’ is defined in subdivision 14 of section 6801 of the Education Law but it is unnecessary to consider the provisions of this section since the plaintiff does not contest the claim that Bayer Aspirin Tablets come within the statutory definition of drugs and conceded it on argument.
It, however, maintains that they are a proprietary medicine excepted by section 6816 (subd. 2, par. c) of the Education Law from the coverage of the statutory law relied upon by the defendants. . This subdivision provides that article 137 of the Education Law shall not apply except as to the labeling of poison-and to adulterating, misbranding and substituting: “ c. To the sale of proprietary medicines except those proprietary medicines ■which are poisonous, deleterious and/or habit-forming.”
There is no statutory definition of the term “ proprietary medicines ”. There are, however, decisions in this and other States in which this term has been considered. Some of the decisions follow what is generally referred to as the common usage meaning, while others give a more technical or restricted meaning to the term proprietary medicines. The plaintiff maintains that the Bayer Aspirin Tablets conform to both definitions.
At the outset, this court wishes it to be clear that this decision relates solely to one product and that is Bayer Aspirin Tablets. Each decision on whether or not a drug is a proprietary one depends solely on the circumstances of the individual case. The courts have consistently taken that view and so hold.
Before considering the question as to the meaning of the term “ proprietary medicines ”, the background of this litigation will be briefly discussed. The plaintiff, a New York corporation, through its president, states that it operates 228 grocery supermarkets in the States of New York, Pennsylvania, Ohio and West Virginia, of which 141 supermarkets are in New York. Plaintiff has sold certain proprietary medicines including Bayer Aspirin Tablets in all of its stores since 1950 and its right to do so has not been questioned except in the State of New York where in January, 1955 inspectors of the defendant New York State Board of Pharmacy entered 12 of its stores and left notices of alleged violations of the law in that Bayer Aspirin Tablets were being offered for sale in plaintiff’s supermarkets. Following some correspondence and negotiations, plaintiff states that under duress, it discontinued the sale of the items listed in the notices in its New York supermarkets.
Bayer Aspirin Tablets are a product, more fully described below, manufactured, packaged and distributed in many countries by the Sterling Drug, Inc., and its subsidiaries. It is *135 stated that in 1958 a majority of all retail sales of Bayer Aspirin Tablets in the United States were made in nondrng outlets. For many years, the Sterling companies have spent many millions of dollars annually in advertising Bayer Aspirin Tablets in all media for advertising. They are sold in every State of the United States and the District of Columbia. Over 20,000,000 Bayer Aspirin Tablets are produced daily. In the year 1958 over five and a half billion Bayer Aspirin Tablets were sold in the United States.
The basic active ingredient of Bayer Aspirin Tablets is a chemical compound known as aeetylsalicylie acid, now commonly referred to as aspirin. Dr. Maurice L. Tainter, a vice-president of Sterling Drug, Inc., and the director of its research subsidiary, in his affidavit gives a history of the discovery, development and refinement of aeetylsalicylie acid, the patent of the product, the expiration of the patent, the registration of the word “ aspirin ” in the United States Patent Office, the court decision holding that the name was in the public domain and could be used by its competitors with certain restrictions. He shows that the trademark consisting of the words “ Bayer ” and “ Bayer ” in the form of a cross and the word “ Genuine ” used in the sale of its Bayer Aspirin Tablets are valid.
The defendants maintain (Griswold’s affidavit) that aspirin is a synonym for aeetylsalicylie acid; that it is a drug intended to affect and does affect the human body; that it is a medicine in general use; that the ingredients of aspirin are the common property of pharmacists and pharmaceutical manufacturers and that aspirin is listed in the Pharmacopeia (U. S. P. XV) and that aspirin tablets can be prepared by any pharmacist or pharmacal manufacturer and conclude that Bayer’s Aspirin Tablets are not a proprietary medicine, and that this is so even though the substance used as a binder may affect the solubility of the tablets.
The current Pharmacopeia (U. S. P. XV) provides that aspirin tablets to meet the required tests must disintegrate in not more than 15 minutes. Plaintiff shows (Winig affidavit, par. 34) that Bayer Aspirin Tablets start to disintegrate in less than 2 seconds and are completely disintegrated within 30 seconds.
It is further stated, in the Griswold affidavit, that manufacturers of aspirin in using diluents, bulking agents, colors, lubricants and adhesives in maldng aspirin tablets, are using substances permitted for such use by the Pharmacopeia since they cannot use any ingredient other than those “ generally considered to be innocuous, for practical purposes devoid of phar *136 macologic activity in the quantities used, and provided they do not interfere with the therapeutic action.” There is no claim by the defendants that these inert ingredients are listed in the Pharmacopeia or that a manufacturer of aspirin tablets is required to disclose or show the kinds or quantities of these ingredients used or the processes and procedures by which they are incorporated into the acetylsalicylic acid in the production of aspirin tablets. In the Tainter affidavit (par. 23) it is stated that the Bayer Aspirin Tablets “ contain nothing required to be excluded by the Pharmacopeia; they contain ingredients (i.e., fillers, binders, lubricants, disintegrants, and tracers) permitted, but not required, by the Pharmacopeia.”
The burden of defendants’ contentions in this connection appears to be that since acetylsalicylic acid is the only active chemical ingredient in aspirin tablets as listed in the Pharmacopeia, all aspirin tablets capable of disintegration within 15 minutes are the same, irrespective of the inert ingredients and secret processes used in the manufacture and tableting of the aspirin. Quite obviously, this is not true, for the logic of this reasoning simply equates the principal ingredient to the end product. It assumes that, given quantities of ingredients or materials will always yield the same product irrespective of the manner of processing. It is common knowledge that the application of the proper measures of time, temperature, order of application and other extrinsic factors constituting secret processes affect the quality and type of product made from specified ingredients. The nomenclature “ aspirin ” does not necessarily denote the quality and characteristics of the aspirin product.
Plaintiff maintains that the listing of aspirin in the Pharmacopeia does not preclude the Bayer Aspirin Tablets manufactured and packaged under secret processes from being a proprietary medicine and shows by the affidavit of Dr. Tainter that since 1942 numerous patented medicines have been listed in the Pharmacopeia and that there are also listed therein several materials such as cotton, sugar, starch, lemon peel, orange peel, chalk, salad oil, salt, yeast, etc., which are commonly sold in grocery stores. Clearly, these listings refute the defendants’ claim that no drug or medicine appearing in the Pharmacopeia list can be sold except in a pharmacy or drugstore and by or under the supervision of a pharmacist or a druggist.
The secret processes -used in the manufacture of Bayer Aspirin Tablets are shown by the plaintiff in the affidavit of Jerome D. Winig, the director of control of the control laboratory of the *137 Sterling subsidiary that produces the Bayer Aspirin Tablets. He describes the numerous processes and procedures used in both the manufacture and the tableting of the Bayer Aspirin Tablets. The processes said to contain guarded secrets are described in considerable detail and illustrated by numerous photographic exhibits attached to the affidavit but without disclosing the secrets of the processes. The affiant in paragraph 34 of his affidavit as proof of the use of secret processes and the superior quality of Bayer Aspirin Tablets sets forth in columnar form the several ways in which it is claimed that the Bayer Aspirin Tablets excel over aspirin tablets made under the requirements of the U. S. P.
The basic meaning of the word “ proprietary ” is exclusive ownership or title to a thing. It is the position of the plaintiff that this exclusive ownership is not confined to the formula of ingredients from which a proprietary medicine is made but applies equally to the secret processes used in the manufacture of the product which give it a superior quality.
The defendants maintain without any proof that the secret processes by which Bayer Aspirin Tablets are manufactured are capable of discovery and, therefore, cannot be owned by Sterling Drug, Inc. No claim is made that these processes have been discovered by any other concern manufacturing aspirin tablets. Until the secret processes are discovered, assuming that discovery is possible, they clearly are in the exclusive possession of Sterling which has the right to use them. The exclusive right to use is the principal incident of ownership. While undiscovered, the processes are more secure in Sterling than if covered by process patents. The property and rights in the secret processes used in the manufacture of a proprietary medicine are clearly of the same character and quality as the holder formerly had in the secret formula of ingredients of his proprietary medicine before they were required to be disclosed by the Pure Food, Drug and Cosmetic Act.
In Webster’s New International Dictionary (2d ed.) the word “ proprietary ” as an adjective is defined: “ 2. Made and marketed by a person or persons having the exclusive right to manufacture and sell such; as a proprietary article, medicine, or food. Chiefly U. S.” In Maloy’s Medical Dictionary for Lawyers, the term “ proprietary ” is defined (p. 393): “ Owned; considered or belonging as property; a proprietary medicine. i Any chemical, drug, or similar preparation used in the treatment of diseases, if such article is protected against free competition as to name, product, composition, or process of manu *138 facture by secrecy, patent, or copyright, or by any other means ’ (A. M. A.).” In Blaldston’s New Gould Medical Dictionary (2d ed., 1956) the adjective “ proprietary ” is defined: “ Any chemical, drug, or similar preparation used in the treatment of diseases, if such an article is protected against free competition as to name, product, composition, or process of manufacture, by secrecy, patent, copyright, or any other means.”
In People v. Bernstein (237 App. Div. 270 [2d Dept., 1932]) the court recognized the “ common usage ” definition for proprietary medicines. The court in affirming the defendant’s conviction of unlawfully using the word “ drugs ” on the door of his store, likened the term ‘ ‘ patent medicines ’ ’ to proprietary medicines. Referring to the former, the court said at page 273, that the ‘1 phrase is colloquially used to describe compounds or proprietary remedies sold in original packages, that is, they are not packaged by the retail vendor '* * The latter are put up by manufacturers or compounders under trade names, and in buying them, the public does not rely upon the presumed or actual skill of the retailer, such as is the case when other compounds or prescriptions are purchased from retailers.” In Matter of White v. State Bd. of Pharmacy (285 App. Div. 486 [3d Dept., 1955]) the court, in affirming the judgment assessing penalties against the petitioner, held that a tube of zinc oxide ointment manufactured by a pharmacal concern and sold by the petitioner in the tube in which it had been prepared by the manufacturer and bearing its name, was not a proprietary medicine under the applicable provisions of the Education Law. It does not appear that any secret processes were used in preparing the ointment by the pharmacal company. The court said (p. 488): “ A medicine in general use, the ingredients of which are the common property of pharmacists or pharmacal manufacturers, is not a ‘ proprietary medicine ’ in the sense the statute uses that term. The name of the manufacturer on such a medicinal product also made by others or compounded by pharmacists generally does not transmute the medicine into a ‘ proprietary medicine ’ within the scope of the statute.”
The court, however, added:
< í There are other combinations and formulas which are so distinctively or exclusively attributable to their producers as to be regarded as specially the maker’s own kind of medicine. Some of these may be 1 proprietary medicines ’ if set off distinctly enough. We need not go further here than to say that we regard the zinc oxide ointment put into a tube by the pharmacal manufacturer and sold by the petitioner as not being a ‘ proprietary medicine ’.
*139 “ There are, no doubt, borderline medicines which are not easy to classify but this is not one of them.”
In Ferguson v. Arthur (117 U. S. 482) the court affirmed the judgment under which the plaintiff was held taxable on a shipment of imported “ Henry’s Calcined Magnesia” at the rate applicable to proprietary medicines. The product was received by the plaintiff in bottles bearing the trade-mark of the manufacturer. Each bottle was wrapped in a circular describing the product. The court said at pages 487-488: “Although it appeared at the trial, that all calcined magnesia ‘ is a well-known medicinal preparation of magnesia, made from sulphate of magnesia, bicarbonate of soda, and calcined by heat,’ and that a formula for the preparation was contained in the dispensatories, it did not appear that Henry’s preparation was made according to that formula, while it did appear that it was universally known by the name of ‘ Henry’s Calcined Magnesia,’ and had a character of its own, distinct from ordinary calcined magnesia, though used for the same purposes * * * By the mode of manufacture used, the carbonic acid is eliminated, the taste and smell are destroyed, other disagreeable qualities are removed, and all grittiness is got rid of. It1 has a character of its own, distinct from ordinary calcined magnesia, ’ as the bill of exceptions states, which must arise from the special mode of manufacture.” Though this case involved duty taxes, it is clearly applicable here for the court held that the manufacturer or producer of a medical product who processed the ingredients in such a manner as to improve the quality so as to gain general acceptance produced a proprietary medicine when it sold the product in bottles bearing his established trade-mark.
In Wrigley’s Stores v. Board of Pharmacy (336 Mich. 583 [1953]) the court recognized the “common usage ” definition for proprietary medicines and held that numerous packaged medical remedies, including aspirin, could be sold in plaintiff’s unlicensed stores. The court in referring to the Michigan Pharmacy Law, said at page 592: “ "We conclude that the permission given by section 18, to sell patent or proprietary medicines, was not intended to be limited to the rare class of patented medicines or secret formulas, but does include authorization to sell prepackaged, nonprescription, mass-produced remedies put up for sale to the general public in the distinctive and original container, and under the trade name of the manufacturer as his product under the rules and conditions set forth in the act.” The following are other decisions recognizing the customary usage definition of proprietary medicines: People v. Heron (34 *140 Cal. App. 2d 755, 761); People v. Ridgeway Drug Co. (324 Ill. App. 585); Kentucky Bd. of Pharmacy v. Cassidy (115 Ky. 690, 705-707); State ex rel. Board of Pharmacy v. McEwen (96 N. W. 2d 189 [Iowa]); State v. Geest (118 Neb. 562); State v. Collins (61 N. M. 184, 187); State v. Cramer (95 Ohio App. 493, 497).
In State ex rel. Board of Pharmacy v. McEwen (supra), in which it appears that proprietary medicines were defined by statute, and in the case of People v. Ridgeway Drug Co. (supra) the courts approved of the classification of Bayer Aspirin Tablets as a safe proprietary medicine or remedy.
In the case of Proprietary Assn. v. Board of Pharmacy of New Jersey (16 N. J. 62 [1954]) the court dismissed an action for a declaratory judgment in which the plaintiff sought a judicial definition of proprietary medicines rather than, as the court said, a declaration as to whether any particular remedy was a proprietary medicine. After the foregoing decision a court of inferior jurisdiction of New Jersey in an unpublished decision, furnished to the court, held that Bayer Aspirin Tablets are a proprietary medicine. (Board of Pharmacy of State of New Jersey v. American Stores Co. [Dist. Ct. Camden Co. — Consolidated Civil Actions 31507-31512, Inc. Oct. 19, 1955].) The same was held by the Municipal Court for the District of Columbia in the case of District of Columbia v. Safeway Stores (Crim. No. DC 9538-58, decided Sept. 15, 1958).
The attorney for the defendants on the argument of the motions and in his brief states that to accept the “ common usage ” definition for a proprietary medicine ‘1 would encompass the vast majority of available drugs ” and “would affect the whole field of drugs.” This calamitous prediction is not one shared by the court for the common usage definition can apply only to drugs that are not poisonous, deleterious or habit-forming (Education Law, § 6816, subd. 2, par. c).
A typical case following the technical definition* of proprietary medicines is State v. Wakeen (263 Wisc. 401) in which the court stated that it concurred with the opinion of the Trial Judge who, referring to aspirin, milk of magnesia and camphorated oil, said (p. 406): “however, the process, the contents and formula are known and are the same in all products regardless of the manufacture. There is nothing secret about it, their identity, quality, purity and strength are set forth in the U. S. P. or N. F., and in fact are made to conform to the standards set therein. If they did not they could not be marketed under the names of aspirin, milk of magnesia and camphorated oil.”
The court below said (p. 405): “ The record shows that aspirin was originally a proprietary medicine. It was discovered *141 in Germany, its formula was secret, and the product was originally made only by the possessor of this secret formula. However, the formula has been discovered, and aspirin is now made by different pharmaceutical and chemical manufacturers, and it has entirely ceased to be a proprietary medicine. ’ ’
It is clearly to be inferred that no claims were made, since none is mentioned in the opinion, by the concerns that manufactured the products in question that they were made by secret processes which improved their medicinal qualities over those made under the U. S. P. requirements.
Other cases following the technical definition of proprietary medicines are the following: State v. Donaldson (41 Minn. 74); State v. Zotalis (172 Minn. 132); State v. Woolworth Co. (184 Minn. 51); Culver v. Nelson (237 Minn. 65); State v. Red Owl Stores (253 Minn. 236); State v. Combs (169 Ore. 566). There may be others but these are the leading cases in this category.
In State v. Woolworth Co. (supra) the court in holding that milk of magnesia sold in bottles was not a proprietary medicine, however, said (p. 53): “ There is no secret about its manufacture or ingredients ”, and in Culver v. Nelson (supra) though it was held that vitamins sold in the form of tablets, capsules or liquids were a drug and not a proprietary medicine, the court said (p. 75): “ It is undoubtedly true that the formula for the preparation of a proprietary medicine need not be secret. However, there must be some right of ownership in either the method or manner of preparation of the vitamin which constitutes the beneficial ingredient of the ultimate product(Emphasis supplied.)
These statements of law from cases adopting the technical definition of proprietary medicines are in accord with plaintiff’s claim that the Bayer Aspirin Tablets manufactured under secret processes giving them qualities superior to those manufactured under the U. S. P. requirements are a proprietary medicine even under the technical definition of proprietary medicines.
This court holds that the Bayer Aspirin Tablets are a proprietary medicine within the provisions of section 6816 (subd. 2, par. c) of the Education Law.
We consider next the question as to whether the provisions of article 137 of the Education Law when construed as prohibiting the sale of Bayer Aspirin Tablets in plaintiff’s supermarkets and similar outlets is constitutional as a valid exercise of the State’s police powers, if it be assumed, contrary to the above finding, that the Bayer Aspirin Tablets are not a proprietary medicine and not excepted from the prohibitory provisions of the statute. More briefly, the question is whether the pro *142 hibition provisions of the statute bear such a relationship to the public health and welfare as to warrant the exercise of the police power.
In considering this question, the court 'assumes as stated at the .outset that it is admitted for the purposes of this motion that Bayer Aspirin Tablets are not poisonous, deleterious or habit-forming. That this is so, as a matter of fact, is shown by Dr. Tainter in his affidavit where he states: “ 44. The practical proof of aspirin’s safety is the fact that every year billions of tablets are safely used by tens of millions of consumers — over 10,000 tons in the United States alone — with extremely low incidence of side effects * # * The occurrence of aspirin allergies among persons not having a general allergic history is essentially zero.”
Plaintiff presents the affidavit of Louis S. Roberts, a vice-president of a research corporation in which he sets forth the results of the studies made by the field analysts of his corporation. The corporation was employed to determine how aspirin and other prepackaged medical products containing aspirin are sold in drugstores and in other stores which have no drug department supervised by a licensed pharmacist. Some of the 49 nondrugstores selected sold none of the aspirin products, while others sold one or more of these products. Four sold aspirin products including B'ayer Aspirin Tablets. Of 100 drugstores selected, 35 sold Bayer Aspirin Tablets on a self-service basis. The affidavit in part reads: “In each instance where Bayer Aspirin Tablets were available on a self-service basis, our analyst selected B'ayer Aspirin Tablets from the display," handed them to the cashier or sales person, paid the appropriate price, and left the store without further comment. ” It is further stated:
“9. In no instance in any of the one hundred purchases was any statement made by any salesperson with respect to the use, dosage or therapeutic effect of Bayer Aspirin Tablets. In most instances, no comment whatever was made by the sales person; in the remaining instances, the only comments made by salespeople were as ask what size was desired, to state the price, to request whether anything further was desired, and to thank the purchaser.
“ To the best of the analysts’ knowledge, in'fifty-three of the one hundred purchases, the salesperson completing the sale was a sales clerk, cashier, or similar employee and did not appear to be a pharmacist.”
The defendants do not deny the above statement of facts as to the manner in which aspirin is sold. Consequently, it appears *143 to this court that so far as the protection of the public is concerned, there is no advantage to restricting the sale of aspiiin to drugstores.
The Secretary to the State Board of Pharmacy in his affidavit states that there are many common drugs which are in constant use which require special handling such as refrigeration and temperature control 'in storage. Attention is called to insulin, biologieals such as smallpox vaccines and glandular products and therapeutic vitamins which he states require special temperature controls in storage. None of these drugs is involved in this litigation and it is significant that no claim is made that any special care is required by a retailer such as refrigeration or other temperature control in carrying Bayer Aspirin Tablets in stock. The only claim so far as handling is concerned is that if aspirin is exposed to the air, that is, if the container is opened, it loses its potency and becomes irritating to the stomach. (See Kenneth S. Griswold’s affidavit of Dec. 15,1959.)
The defendants, in their brief state that a purchaser of drugs relies upon the druggist and not upon the manufacturer, and continues: “He finds several brands of aspirin — ‘Baver’, ‘ Squibb ’ and others available. He asks the pharmacist which he should buy and he gets a professional answer. The pharmacist may say ‘ either ’ or he may indicate his views in connection with some particular manufacturer”. The defendants here assume a strange position in maintaining that it requires the professional answer of a pharmacist as to which aspirin tablets a customer should buy when they claim that all aspirin tablets are the same.
The State Commissioner of Education is concerned lest a purchaser of Bayer Aspirin Tablets in supermarkets “ will lose the respect for the potential of drugs ” which must be carefully used in compliance with directions. His principal concern appears to be directed to the education of future pharmacists whose length of study, he believes, will have to be increased. He is apprehensive that the monetary inducement will be insufficient for prospective pharmacists if the retail sale of harmless, nonpoisonous prepackaged medical remedies sold under trade names, such as Bayer Aspirin Tablets, are not restricted to pharmacies, drugstores and licensed stores. This even though no professional judgment or discrimination is required or used in making sales. Obviously, there is no warrant for police power legislation giving drugstores a monopoly on economic grounds in the retail sales of prepackaged proprietary medicines, such as Bayer Aspirin Tablets, sold to a great extent in these stores on a self-service basis. This is particularly so when the drug *144 stores are not restricted to the sale of drugs. It is common knowledge that most of the so-called drugstores are engaged in a wide field of merchandising having no connection with drugs.
It appears that the druggists exercise no greater care than anyone else in selling this drug and have no greater duty of care in selling it. This court is of the opinion that the sale of this product does not require special skills possessed peculiarly by pharmacists and druggists and that they do not exercise any special skill in its sale. The purchaser obtains no additional benefit from making his purchase in a drugstore. Even when making’ it in a drugstore, his dealings are as often as not with one who is not a licensed pharmacist. It does not appear that there is any relation between ingestion or taking of excess amounts or improper use, and the place and the manner in which the aspirin was purchased.
The public gains nothing by the State’s giving a monopoly to the druggists to market this product. That the monopoly is to bolster economically those who are licensed as pharmacists is not a sufficiently good reason to permit the restriction. There is ample economic opportunity for the pharmacists and druggists as they are a necessary, important and respected part of our communities. Their services as such are indispensable.
The facts before the court fail to show any such relation in the sale of Bayer Aspirin Tablets to the public health or welfare as would justify the exercise of the police power by the State.
In Defiance Milk Prods. Co. v. Du Mond (309 N. Y. 537) the court held a statute unconstitutional which prohibited the sale of evaporated skimmed milk except in containers or packages containing 10 pounds or more. The court said (p. 541) “ due process demands that a law be not unreasonable or arbitrary and that it be reasonably related and applied to some actual and manifest evil ’ ’. The court further stated ‘1 All those rules, read together, mean that the property of a citizen including his right to sell nondeleterious substances may not be taken from him without rhyme or reason.” (Emphasis supplied.)
In Fisher Co. v. Woods (187 N. Y. 90, 94) the court said: “ To justify the state in interposing its authority in behalf of the public, it must appear that the interest of the public generally, as distinguished from those of a particular class, require such interference and that the means are reasonably necessary for the accomplishment of the purpose and not unduly oppressive upon individuals. The legislature may not, under the guise of protecting the public interest, arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations.”
*145 In People v. Marx (99 N. Y. 377) the court; in holding a statute prohibiting the sale of oleomargarine unless made of milk products unconstitutional, discussed the constitutional guarantees and said (p. 386): “Among these no proposition is now more firmly settled than that it is one of the fundamental rights and privileges of every American citizen to adopt and follow such lawful industrial pursuit, not injurious to the community, as he may see fit.”
In Trio Distr. Corp. v. City of Albany (2 N Y 2d 690) the court held an ordinance of the City of Albany unconstitutional which required itinerant vendors of ice cream products sold from sanitary trucks in the city streets to have each truck manned by two attendants, the duty of one being to protect children from traffic hazards. The court, after citing a Michigan case, said (p. 695): “ As is observed in the case last cited, the police power is not designed to aid one group in a community against another, as the courts of this State have frequently had occasion to hold (Defiance Milk Prods. Co. v. Du Mond, 309 N. Y. 537 * * *).”
In People ex rel. Pinello v. Leadbitter (194 Misc. 481, affd. 275 App. Div. 864, affd. 301 N. Y. 695) the court held a city ordinance providing that barbershops should not be opened before 8:30 a.m. and closed not later than 6:30 p.m., unconstitutional. In Pratter v. Lascoff (140 Misc. 211, affd. 236 App. Div. 713, affd. 261 N. Y. 509) the court, upon the authority of Liggett Co. v. Baldridge (278 U. S. 105), held that so much of the then sections 1352 and 1354 of the Education Law as forbade the issuance by the State Board of Pharmacy of a certificate of ownership of a pharmacy to the plaintiff who was not a licensed pharmacist was unconstitutional as in violation of the Fourteenth Amendment to the United States Constitution. The law applicable here is succinctly stated in Burns Baking Co. v. Bryan (264 U. S. 504) where the court stated (p. 513): “A State may not, under the guise of protecting the public, arbitrarily interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them.”
In the following cases, it has been held, under the pharmacy laws of several States, that proprietary medicines packaged for retail sale may be sold by grocery stores and similar outlets and that statutes providing that such medicines must be sold only by pharmacists when they are not required to know or be responsible for the contents of the products, are unconstitutional. The cases hold that under such circumstances there is no basis for the exercise of a State’s police power. (State v. *146 Donaldson, 41 Minn. 74, supra; State v. Childs, 32 Ariz. 222, 233-234; Noel v. People, 187 Ill. 587; State v. Wood, 51 S. D. 485, 492; State v. Geest, 118 Neb. 562, 568, supra; State v. Stephens, 102 Mont. 414, 423.)
In State v. Donaldson (41 Minn. 74, 81-82, supra) the court said: “ There is nothing that calls into use any skill or science on the part of the one who sells them * * * The fact that the seller is a pharmacist, of itself, furnishes no protection to the public * * * It is suggested that the mere fact of limiting the sale to pharmacists would tend to protect the public, because they would be more likely to know the qualities of these patent medicines, and hence less likely to sell those that would be prejudicial to health. But this possibility is too uncertain and attentuated to be entitled to any weight ” (p. 82).
In Noel v. People (187 Ill. 587, 593, supra) the court said: “ The vice of the present Pharmacy act is that it gives to the registered pharmacists the exclusive privilege of selling these patent and proprietary medicines and remedies, and excludes all other persons from doing so, while, at the same time, it makes no requirement of such registered pharmacists that they make any analysis, inspection or examination of the same. In this regard the act gives to registered pharmacists a monopoly of the business of selling patent medicines without in any manner protecting the public health. The public health is not protected by limiting these sales to registered pharmacists, who make no examination of what they sell. ’ ’
The defendants 'attempt to distinguish the above cases by stating in their memorandum that a pharmacist is responsible for a drug sold in its original container while a grocery clerk is not. If a pharmacist complies with the law (Education Law, § 6805, subd. 1; § 6823, subd. 3) he assumes no responsibility and incurs no liability. In Commissioners of State Ins. Fund v. City Chem. Corp. (290 N. Y. 64, 69) the court said: “ ordinarily a mere dealer who vends such a dangerous and mislabeled drug in its original package is not liable without proof of some real negligence on his part.” (See, also, Parker v. State of New York, 201 Misc. 416, 421, affd. 280 App. Div. 157.)
The case of State Bd. of Pharmacy v. Matthews (197 N. Y. 353) is not applicable here. In that case the court held that tincture of iodine, spirits of camphor and tincture of arnica were “medicines” within the meaning of that term as used in the pharmacy statute which provided that no unlicensed employee should be allowed to sell medicines or poisons except under the supervision of a licensed pharmacist. The medicines in question bought by plaintiff’s inspectors at one purchase were *147 compounded, bottled and sealed and placed on the counter by defendant’s pharmacist and sold in his absence by an unlicensed clerk. The court (p. 356) said that it took judicial notice that the articles sold were medicines and “ so far as tincture of iodine is concerned the uncontroverted evidence in the case proves that it is a poison.” The court assumed that the unlicensed clerk could mix or compound the medicines, which a clerk in the sale of Bayer Aspirin Tablets could not do, for it stated (p. 359) that there were strong reasons for extending the statute to embrace harmless household remedies — “that is, which may be harmless if properly prepared.” The court continued ‘1 The injury to the public health which might ensue if such medicines were carelessly or ignorantly compounded so as to contain deleterious ingredients or deceptively, so as to be something different from what they purported to be, is manifest. The police power logically extends to such medicines no less than to poisons and other lethal medicinal agents.” (Emphasis supplied.)
There remain two contentions of the plaintiff. It maintains that if the New York Pharmacy Law were to be construed to apply to the retail sale of Bayer Aspirin Tablets, a safe medical remedy, it would be unconstitutional as in conflict with the Federal Food, Drug and Cosmetic Act of 1938 as amended (U. S. Code, tit. 21, §§ 301, 351 et seg,; 52 U. S. Stat. 1049-1053; 65 U. S. Stat. 648-649). The court fails to find in the statute any indicia of intention on the part of Congress to pre-empt the field relating to the retail sale of drugs and proprietary medicines in the several States. No decisions have been submitted that support plaintiff’s position.
The plaintiff also claims that the procedural provisions of subdivision 2 of section 6823 of the Education Law under which violations of the Pharmacy Law may be found and penalties imposed is unconstitutional as a denial of due process of law. The principal objection is that plaintiff, a retailer, not a pharmacist, is to be judged by a tribunal, all of whose members are pharmacists (Education Law, § 6801, subd. 2; § 6802, subds. 1-3) and whose findings in an action to recover the penalties “ shall be conclusive proof of such violation and the penalty therefor ”, which may be in the sum of $500, but not in excess of that amount for each violation. Though the finding of a violation may be reviewed in a proceeding under article 78 of the Civil Practice Act, the vice remains of a trial committee constituted of presumptively biased members which falls below the standard of legally constituted tribunals and merits the criticism received from committees of the Legislature and others (1957 Annual *148 Report of Joint Legislative Committee on Imitation Food Products and Problems, N. Y. Legis. Doc., 1957, No. 34, p. 65; 1958 Annual Report of Joint Legislative Committee on Imitation Food Products and Problems, N. Y. Legis. Doc., 1958, No. 56, pp. 66-67). The policy of the Board of Pharmacy in refusing to furnish the plaintiff and others with a list of proprietary medicines that may he sold in nondrug outlets shows an arbitrary administration of the law (J. R. Peachy affidavit, p. 2; Public Hearing of Joint Legislative Comm, on Imitation Food Products and Problems, Feb. 19, 1958, pp. 62-63). However, since the defendant Board of Pharmacy has made no formal determination that the plaintiff has violated the law or imposed any penalties, the court will decline at this time to pass upon this constitutional question raised by the plaintiff.
The court holds that upon the facts found herein, the plaintiff is entitled to a summary judgment against the defendants. The judgment should provide that the plaintiff has the right to sell Bayer Aspirin Tablets without first obtaining for its retail establishments registration certificates from defendant New York State Board of Pharmacy and to make such sales through employees who have not obtained licenses from defendant New York State Board of Pharmacy, or who are not acting under the supervision of persons so licensed. It should also enjoin defendants from proceeding directly or indirectly against the plaintiff in any way which would interfere with plaintiff’s right to sell Bayer Aspirin Tablets in its retail establishments and enjoin defendants from instituting any proceeding against plaintiff under subdivision 2 of section 6823 of the New York Education Law.
The injunction provisions in the judgment, however, shall not become effective for a period of 30 days from the time it is entered and served. This is to give the defendants, if they desire to appeal, time to file notice of appeal and to apply to the appellate court for a stay. Submit judgment accordingly.