LOBLAW, INC., Respondent, *v.* NEW YORK STATE BOARD OF PHARMACY et al., Appellants.

Fourth Department, January 12, 1961.

*Louis J. Lefkowitz, Attorney-General (Paxton Blair* and *Henderson G. Riggs* of counsel), for appellants.

*Charles A. Brind, Jr., Counsel, State Education Department (John P. Jehu, Elizabeth M. Eastman* and *George B. Farrington* of counsel), for appellants.

*Jaeckle, Fleischmann, Kelly, Swart & Augspurger (Mathias F. Correa* and *William E. Hegarty* of counsel), for respondent.

*Clarence R. Runals* and *Thomas R. Mathias* for Pharmaceutical Society of State of New York, Inc., *amicus curiæ.*

WILLIAMS, P. J. The defendants, State Board of Pharmacy *et al.,* have appealed from a judgment in favor of the plaintiff which provides in effect that plaintiff may sell Bayer Aspirin Tablets in its retail stores in New York State without complying with certain provisions of the Education Law regulating the sale of drugs.

The technical name of the product commonly known as aspirin is acetylsalicylic acid. We shall refer to it as aspirin. It is not disputed that it is a drug. The manufacturer of Bayer Aspirin Tablets is the Sterling Drug Company. The plaintiff's only interest in this controversy is to establish the right to continue to sell these tablets in its retail stores.

A very informative discussion of the historical aspects of " aspirin " may be found in the statement of facts and opinion written by Judge LEARNED HAND in *Bayer Co.* v. *United Drug Co.* (272 F. 505). At one time, the Bayer Company, Inc., the predecessor of Sterling Drug Co., owned the patent on the product known as aspirin and the common-law as well as the registered trade-mark in the name. However, this patent expired in 1917 and the registered trade-mark of the name expired through cancellation on November 30, 1918. Because of the manner in which the product was handled, sold and distributed by Bayer Co., Inc., and its predecessor, the exclusive right to use the name " aspirin " was lost, and, of course, upon the expiration of the patent, the exclusive patent rights in the product were also lost. Thus, since 1917, neither Bayer Co., Inc., nor the Sterling Drug Co. has had exclusive rights in the product or in the name " aspirin ". In the action brought by Bayer, the court refused to enjoin the use of the name " aspirin " by the United Drug Company, but did enjoin the use of the words " genuine Aspirin." This holding entailed a determination that Bayer had no exclusive rights either to manufacture aspirin or to the use of that name.

Plaintiff is a New York State corporation which operates many so-called retail supermarkets in this and other States. It has been selling prepackaged " Bayer Aspirin Tablets " for some years at its various stores without such stores being registered as pharmacies and without licensed and registered pharmacists supervising such sales (see Education Law, § 6805). All of this is conceded by plaintiff but it is contended that such registration and supervision is unnecessary for reasons which we shall discuss.

Article 137 of the Education Law regulates the sale and distribution of drugs in the State of New York. Inasmuch as aspirin is a drug, the provisions of the article apply to it. They also apply to " Bayer Aspirin Tablets ", the product in question, unless these tablets are excepted from the operation of the article as " proprietary medicines."

The plaintiff claims, and Special Term has found, that such tablets are " proprietary medicines " and as such are exempt from the application of the article. Plaintiff also contends that,

in any event, any attempt to interfere with the free and unlicensed sale of these tablets is unreasonable, arbitrary, discriminatory and therefore unconstitutional.

In order to understand the purposes and scope of article 137 of the Education Law, references to certain specific sections are necessary, with a foreword that the general purpose of the article is the regulation of the sale and distribution of drugs in this State.

Subdivision 14 of section 6801 states:

" ' Drugs ' means:

" a. Articles recognized in the official United States pharmacopoeia, official homeopathic pharmacopoeia of the United States, or official national formulary, or any supplement to any of them.

" b. Articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals.

" c. Articles (other than food) intended to affect the structure or any function of the body of man or other animals."

It is not questioned that aspirin is included in all of these categories.

By virtue of section 6802, the State Board of Pharmacy is given the power and duty to regulate and control the practice of pharmacology, the sale of drugs and the character and standard of drugs. " ' Pharmacology ' is the science that treats of drugs and medicines, their nature, preparation, administration and effect." (§ 6801, subd. 12.) Section 6805 requires that drugs be sold in licensed pharmacies or drugstores under the personal supervision of licensed pharmacists except under certain circumstances stated in that section, which are not here pertinent. Other sections of the article apply to working hours and conditions; to adulteration, misbranding and substituting; when sales shall be only on prescription; the keeping of records; and the control of sale and distribution generally.

Section 6816, under which the first phase of our problem arises, excepts certain products from the scope of the act. Subdivision 2 provides: " Except as to the labeling of poison and to adulterating, misbranding and substituting, it [Article 137] shall not apply: * * * (c) To the sale of proprietary medicines except those proprietary medicines which are poisonous, deleterious and/or habit forming."

It is the claim of plaintiff, resisted by the defendants, that " Bayer Aspirin Tablets " come within the definition of " proprietary medicines " and are thus excluded from the operation and control of the article.

There is no definition of " proprietary medicines " in the statute. Therefore, we must look elsewhere in our efforts to

determine what products the Legislature intended these words to include. Dictionary definitions are not too helpful. In Webster's New International Dictionary (Merriam-Webster, 2d ed., Unabridged), the adjective "proprietary" is defined: "Made and marketed by a person or persons having the exclusive right to manufacture and sell such; as a *proprietary* article, medicine or food." The noun "proprietary" is defined as "One who has exclusive title to a thing; one who possesses the dominion, or ownership, of a thing in his own right".

Maloy's Medical Dictionary for Lawyers (2d ed.), defines "proprietary": "Owned; considered or belonging as property; a proprietary medicine. 'Any chemical, drug, or similar preparation * * * if such article is protected against free competition as to name, product, composition, or process of manufacture by secrecy, patent, or copyright, or by any other means' (A. M. A.)."

It will be noticed that in these definitions, exclusive titles and rights are stressed. Of course there is no exclusive right of Sterling Drug Co. in aspirin. The plaintiff, however, contends that, although Sterling has no proprietary right to the drug aspirin, it has exclusive proprietary rights in the tablets known as "Bayer Aspirin Tablets." It is claimed that these tablets are of a special composition, color and design and are manufactured under a secret process; that the binder used is special and secret; that the quality of these tablets is superior to that of other aspirin tablets; and that they are more quickly dissolved. It is also claimed that large sums of money have been expended in advertising and educating the general public as to their quality and efficacy and that in purchasing them, the public relies on the manufacturer and not on the real or presumed skill of the vendor. The contention is that all of these things have created the proprietary medicine known as "Bayer Aspirin Tablets".

There are various rules and standards which the courts have applied in determining whether a specific product is a proprietary medicine.

Some of these decisions have been based on a technical or literal construction of the words themselves. These decisions reason that there must be a proprietary or exclusive right or interest in some proprietor patentee. (See e.g. *State* v. *Donaldson*, 41 Minn. 74, 83.) Other authorities which have adopted this reasoning are: *State ex rel. Missildine* v. *Jewett Market Co.* (209 Iowa 567) (now changed by statute); *State* v. *Zotalis* (172 Minn. 132); *State* v. *Wakeen* (263 Wis. 401); *Culver* v. *Nelson* (237 Minn. 65); *State* v. *Combs* (169 Ore. 566); *State* v. *Stephens* (102 Mont. 414) (but statute declared unconstitutional).

Other courts approach the problem on the basis of the attitude of the general public in purchasing these products. In other words, has the manufacturer enhanced the name, design and style of merchandising, to the extent that the purchasing public accepts the product by name and reputation without more? This involves a consideration of prepackaging, trade-marks, trade names, slogans and other factors. The application of these principles has resulted in what is sometimes termed the " common usage " definition. Some of the determinations made under this general approach are: *People* v. *Heron* (34 Cal. App. 2d 755) (see especially the concurring opinion by SHAW, P. J.); *Wrigley's Stores* v. *Board of Pharmacy* (336 Mich. 583); *Kentucky Bd. of Pharmacy* v. *Cassidy* (115 Ky. 690).

A comparatively recent case that has rejected this common usage approach is *State* v. *Red Owl Stores* (253 Minn. 236 [1958]), which reaffirms many preceding holdings in that State to the effect that there must be an exclusive right of property in some proprietor to place the product involved in the category of a proprietary medicine. These are: *State* v. *Donaldson* (41 Minn. 74, *supra*) (preparation known as " Beef, Iron and Wine "); *State* v. *Zotalis* (172 Minn. 132, *supra*) (aspirin); *State* v. *Woolworth Co.* (184 Minn. 51) (milk of magnesia); *Culver* v. *Nelson* (237 Minn. 65, *supra*) (vitamin capsules).

Authorities of certain States which decide problems that appear similar must be analyzed and accepted with caution because they frequently depend on the precise language of the statutes of those States. (*State ex rel. Bd. of Pharmacy* v. *McEwen,* 250 Iowa 721; *People* v. *Ridgeway Drug Co.,* 324 Ill. App. 585; *State* v. *Cramer,* 95 Ohio App. 493.)

The only really persuasive decision in New York State which has come to our attention is *Matter of White* v. *State Bd. of Pharmacy* (285 App. Div. 486 [1955]). There, the question involved was whether or not zinc oxide, sold in the original tube, bearing the manufacturer's name, was a proprietary medicine within the exception of the statute. On this point, the court held that it was not, stating: " The name of the manufacturer on such a medicinal product also made by others or compounded by pharmacists generally does not transmute the medicine into a ' proprietary medicine ' within the scope of the statute."

" Many medicines that have had general public usage for long periods of time, of commonly known ingredients and put together by pharmacists as well as pharmacal manufacturers, are presently sold in packages under the names of the people

who make them. They are not regarded as 'proprietary medicines' in the meaning that term has acquired with usage. Zinc oxide ointment, we think, is not different.

"There are other combinations and formulas which are so distinctively or exclusively attributable to their producers as to be regarded as specially the maker's own kind of medicine. Some of these may be 'proprietary medicines' if set off distinctly enough  *  *  *  There are, no doubt, borderline medicines which are not easy to classify, but this is not one of them" (p. 488).

We see no real distinction between zinc oxide ointment sold in a tube containing the name Norwich Pharmacal Company and aspirin sold in a box or bottle containing the name "Bayer Aspirin Tablets." Both are drugs of common usage over which no one has an exclusive or proprietary right; both may well be sold because they are zinc ointment and aspirin, respectively, rather than because they bear the names of Norwich and Bayer.

We do not think that Bayer Aspirin Tablets are "so distinctively or exclusively attributable to their producers as to be regarded as specially the maker's own kind of medicine." (*Matter of White, supra,* p. 488.)

There is, of course, no evidence as to what secret process is claimed. Thus there is only a claim of secrecy without any evidentiary or factual backing. There can be no secrecy as to the essential ingredients. (Federal Food, Drug and Cosmetic Act, U. S. Code, tit. 21, § 352; 55 U. S. Stat. 851, as amd. by 67 U. S. Stat. 389, eff. Aug. 5, 1953.) Furthermore, the contentions that the quality is higher than that required by the United States Pharmacopœia are unimpressive since there is no proof of a qualitative comparison with competitive brands. The same can be said for the claim of rapid solubility.

One should not be able to establish a drug as a "proprietary medicine" where its basic and essential elements are known to, and freely used by the public, simply by claiming that he employs secrets in its manufacture and holds a distinctive and well-known trade-mark.

If this drug is to be excepted from the control of the statute the right to exception should be clear. The general plan of the article contemplates comprehensive control over all drugs with few exceptions and it would obviously be out of harmony with the plan, to permit a manufacturer of a basically common product, to be excepted, while other manufacturers of the same basic product are not. The plan should not be destroyed by piecemeal exceptions unless they are clearly warranted.

It is our conclusion that these tablets are not "proprietary medicines" and therefore not excepted from the operation of the article by section 6816 (subd. 2, par. c). We do not, therefore, reach the question as to whether they are poisonous, deleterious and/or habit forming. Indeed, were such a determination necessary, we would probably require more proof than is contained in the record. In the opinion of the Special Term Justice, it is stated that during the argument of these motions, counsel for the defendants admitted that no claim was made that these tablets were a harmful remedy. We find no such admission in the transcript of the argument, and thus, this matter could not be decided on the basis of a concession. But as we have stated, we do not reach the point, not because the record necessarily bears out the fact that the tablets are not "deleterious", but because it is not necessary to determine that question.

We shall now consider plaintiff's contention that interference with the free and unlicensed sale of these tablets is unreasonable, arbitrary, discriminatory and therefore unconstitutional.

This argument would have no validity unless the record supported the plaintiff's claims that the tablets are not poisonous, deleterious and/or habit forming; for if they are, there could be no exception from the effect of the article, even though they were "proprietary medicines."

However, because this point has been so forcefully briefed and argued, we shall discuss it. In so doing, we must of necessity and for this purpose only, assume that the tablets are not harmful.

The contention is that the restriction of sales to registered pharmacies, of a harmless drug, infringes upon plaintiff's constitutional right to engage in a lawful business and is a deprivation of property without due process of law. Although plaintiff labels its constitutional argument as a violation of substantive due process, spelled out, it is in effect concerned also with equal protection, and privileges and immunities. In addition to the claimed deprivation of the opportunity to engage in a useful occupation, it is further contended that there is no justification for permitting pharmacists to sell this harmless drug while prohibiting other retailers from doing so. It is argued that the manner and method of sale in many instances is the same in both cases, or in other words that even when sold in pharmacies there is no personal supervision of the sale by a pharmacist. Further, that there is no benefit to the public health and welfare by restricting sales to pharmacies,

We are dealing with the police power of the State. This is one of its broadest powers and its exercise is limited only by the requirement that there be a reasonable relationship to the public health or welfare and that it not be exercised arbitrarily.

There is a strong presumption of constitutionality attached to a legislative enactment; it is presumed to be supported by facts known to the Legislature (*United States* v. *Carolene Prods. Co.,* 304 U. S. 144, 152; *Borden's Co.* v. *Baldwin,* 293 U. S. 194, 209; *Wiggins* v. *Town of Somers,* 4 N Y 2d 215, 218; *Lincoln Bldg. Assn.* v. *Barr,* 1 N Y 2d 413, 415; *Defiance Milk Prods. Co.* v. *Du Mond,* 309 N. Y. 537, 540). This presumption is, of course, rebuttable, but he who would rebut must show that there is no permissible interpretation of all the facts which justifies the imposition of the police power (*Matter of Wulfsohn* v. *Burden,* 241 N. Y. 288, 297; *Harman* v. *Board of Educ. of City of N. Y.,* 300 N. Y. 21, 31).

In the present case, the tablets are admittedly drugs, and as such, directly affect the health of the people of this State (cf. *Matter of Engelsher* v. *Jacobs,* 5 N Y 2d 370). That the State can regulate and control the sale and distribution of drugs, per se, cannot be doubted (*State Bd. of Pharmacy* v. *Matthews,* 197 N. Y. 353). Plaintiff's position, however, is that while the State may regulate the sale and distribution of drugs which are harmful, it may not do so when a drug is not harmful. In effect, plaintiff says that placing all drugs into a single classification for purposes of regulation, is arbitrary. With this we cannot agree. To sustain its position, plaintiff must show that there is no reasonable basis for the classification (*Matter of Engelsher* v. *Jacobs, supra*; *Strauss* v. *University of State of N. Y.,* 2 A D 2d 179, mod. 2 N Y 2d 464, appeal dismissed 355 U. S. 394; *Wiggins* v. *Town of Somers,* 4 N Y 2d 215, *supra*; *Defiance Milk Prods.* v. *Du Mond,* 309 N. Y. 537, *supra*). It appears that the Legislature has determined that, in general, public health and welfare require that drugs be sold in pharmacies subject to regulation. Unless the legislative plan violates some constitutional provision, the remedy of those who disagree is to be found in the Legislature and not in the courts (*Matter of Viemeister,* 179 N. Y. 235). It is a well-established principle of constitutional law that in curbing an evil, the Legislature need not strike out at all facets of that evil. It may proceed on a step-by-step basis. Because it could have gone further than it did, does not make the step taken arbitrary. For example, a ban on the sale and distribution of cigarettes has been upheld as a valid exercise of the police power even though other forms of tobacco were not affected (*State* v. *Nossaman,* 107

Kans. 715, writ of error dismissed 258 U. S. 633). In *People ex rel. Nechamcus* v. *Warden* (144 N. Y. 529) an ordinance of the City of New York was upheld which required the licensing of master plumbers even though there was no requirement that journeymen plumbers be licensed. In *People* v. *Schweinler Press* (214 N. Y. 395), a law prohibiting women from working after nine o'clock in the evening was upheld as a valid exercise of the police power, over the objection that in many cases, such work for short periods would not be harmful. The answer to this objection was succinctly stated:

"The legislature was justified in preventing any such evils as those which were outlined, both real and fairly to be anticipated, by any legislation which reasonably tended to prevent them, and it had a *wide discretion* in formulating the means it would adopt to this end" (p. 406; emphasis supplied).

"It is not a basis for a constitutional objection to a statute like this generally prohibiting the labor of women between certain hours that in exceptional cases it may prevent employment of some women for a short time between those hours under such conditions as would be productive of no substantial harm. A legislature must legislate in general terms, and its mandates are not constitutionally vulnerable because having power to act concerning a certain subject and to legislate in terms reasonably calculated to accomplish the general purpose within the scope of its authority, it covers and prohibits some isolated transaction which by itself would be harmless and unobjectionable" (p. 407).

Of similar import is *City of Rochester* v. *Gutberlett* (211 N. Y. 309) (regulation of garbage collection); *People* v. *Arlen Service Stations* (284 N. Y. 340) (regulating size of signs in gasoline stations); and *Biddles, Inc.* v. *Enright* (239 N. Y. 354) (prohibition of auction sales of jewelry at night). The instant case is not an example of a statute which is aimed at favoring one class at the expense of another (see *People* v. *Kuc,* 272 N. Y. 72, and *Trio Distrs. Corp.* v. *City of Albany,* 2 N Y 2d 690), nor an attempt at completely eliminating a wholesome product from the retail market (see *Defiance Milk Prods. Co.* v. *Du Mond,* 309 N. Y. 537, *supra*).

Nor can the classification be deemed arbitrary. The United States Supreme Court has upheld a State statute which prohibits an optician from fitting or duplicating lenses or even frames without a prescription from an ophthalmologist (*Williamson* v. *Lee Optical Co.,* 348 U. S. 483). More recently, the Court of Appeals has upheld, over claims of denial of equal protection, a city ordinance requiring certain size hospital rooms

in private proprietary hospitals, while other hospitals were not so restricted. The theory behind the classification was that the other hospitals were already subject to regulation by other bodies politic (*Matter of Engelsher* v. *Jacobs,* 5 N Y 2d 370). This is much the situation here. Pharmacists are closely regulated by article 137 of the Education Law while retailers generally are not. As pointed out in *Engelsher,* there is no denial of equal protection where everyone within the same class is treated alike (p. 375). Here, all pharmacists are treated alike and all general retailers are treated alike.

If, as plaintiff contends, the sale of these tablets is not supervised in pharmacies, this is not reason for excepting them from the operation of the article. To remove them from the control contemplated by the article, would forever bar appropriate control, if it be necessary, even in pharmacies.

We conclude, therefore, that restricting the sale of '' Bayer Aspirin Tablets,'' even though they may be harmless, to registered pharmacists, is a valid exercise of the State's police power. In so holding, we recognize that some other States have held such statutes to be unconstitutional on grounds of denial of due process, equal protection or privileges and immunities (see, e.g., *State* v. *Geest,* 118 Neb. 562; *State* v. *Childs,* 32 Ariz. 222; *Noel* v. *People,* 187 Ill. 587; *State* v. *Wood,* 51 S. D. 485; *State* v. *Stephens,* 102 Mont. 414, *supra*). On the other hand, other States have upheld such restrictions (see, e.g., *State* v. *Red Owl Stores,* 253 Minn. 236, *supra,* and cases cited therein; *State* v. *Combs,* 169 Ore. 566, *supra; State* v. *Wakeen,* 263 Wis. 401, *supra; North Carolina Bd. of Pharmacy* v. *Lane,* 248 N. C. 134).

It is our view that the claim for unconstitutionality on the theory that the public is no more protected in buying from a pharmacist than when buying from a general retailer, overlooks the basic fact that aspirin is a drug and as such may be regulated by general legislation under the police power.

Finally, the plaintiff contends that the procedural provisions contained in subdivision 2 of section 6823 of the Education Law with respect to violations of the pharmacy article are inconsistent with procedural due process. But there is no proceeding against plaintiff under that section. Therefore, it is not necessary that we determine whether or not these provisions are consistent with due process because they were not invoked and they are not before us.

The judgment in favor of the plaintiff must be reversed and judgment granted in favor of the defendants against the plaintiff determining and declaring that '' Bayer Aspirin Tablets '' are not '' proprietary medicines ''.

GOLDMAN, J. (dissenting). I cannot agree with the determination reached by the majority that Bayer Aspirin is not a "proprietary" medicine within the meaning of section 6816 (subd. 2, par. c) of article 137 of the Education Law. I concur completely with Special Term's conclusion in this respect. The exhaustive memorandum of Justice MOULE in my view correctly sets forth the state of the authorities in New York and all other jurisdictions on the subject and no good purpose can be served by repeating what he has so ably written.

In my judgment Bayer Aspirin is a proprietary medicine within the "common usage" definition of that term. The appellant Board of Pharmacy's position that Bayer Aspirin is not protected by letters patent and therefore cannot be a proprietary medicine embraces a narrow and limited definition of the term which has not been applied by the courts of this State and many others nor by the general public in its understanding of the term. Indeed, to equate either the ownership of a patent or the exclusive right to sell with the existence of a proprietary medicine is giving to the term a very limited connotation not recognized by the medical or pharmaceutical professions. Definitions of "proprietary" taken from all leading medical dictionaries include "any chemical, drug, or similar preparation used in treatment of diseases, if such article is protected against free competition as to *name* * * *" (Dorland's Illustrated Medical Dictionary [23d ed.], p. 1113, italics supplied; Blakiston's New Gould Medical Dictionary [2d ed.]; Journal of Amer. Pharmaceutical Assn., 1915, vol. IV, p. 1152). Even under this technical and limited definition it is clear that Bayer Aspirin meets this test for in addition to the protection of the name by the Bayer trade-mark, it is further protected by the secondary meaning the word "Bayer" has achieved over the years in the minds of the purchasing public. Surely, Bayer Aspirin is "set off distinctly enough" to fall within the category of proprietary medicines as laid down in *Matter of White* v. *State Bd. of Pharmacy* (285 App. Div. 486, 488).

Without adverting to the multitude of authorities recited in Special Term's memorandum, I believe that the "common usage" definition found in *Wrigley's Stores* v. *Board of Pharmacy* (336 Mich. 583) should be applied to this issue in the case at bar. The five requirements there set forth are (1) a medicine in which a property right exists in the producer and which the public buys in reliance primarily on the producer or the proprietor and not the retailer, (2) the property right may be attributed to a patent, trade-mark, special formula or unique process for preparation, (3) distribution is in prepackaged and fully

prepared form ready for use by the consumer with adequate directions for use, (4) extensive advertising by brand name so that the public relies on the name, (5) no prescription is needed. That this test is generally adopted is demonstrated by the uncontroverted fact that Bayer Aspirin is sold freely in non-drugstore outlets in 46 States and the District of Columbia.

The use of the word " proprietary " in the statute has been continuous since 1897 (L. 1897, ch. 297) when it was a part of section 187 of the Public Health Law, one of the sections from which section 6816 (subd. 2, par. c) of the Education Law was derived. To give to it the limited definition, i.e., protected by patent, urged by the appellant board is to exalt language over substance and adopts a construction which has no practical benefit to the public. The board argues that there is something magic about the work " proprietary ". If the manufacture and sale of a medicine which is not " poisonous, deleterious and/or habit forming " is protected by a patent it may be freely sold by any retailing outlet without restriction. What reason in common sense should require a change in this manner of distribution simply because 17 years have elapsed and the exclusive property right secured by patent has expired? Does this fact standing alone make the sale of such a product by businesses other than registered pharmacists evil whereas for 17 years before, when protected by patent, the law sanctioned its distribution by sources other than druggists? If so, why? Surely, no reasonable answer would be that the limited definition of the word " proprietary " requires it. I submit that there is no reason compatible with logic which can be advanced for the determination demanded by the appellants in this respect.

In addition to adopting the " common usage " definition, Special Term buttressed its finding that Bayer Aspirin was a proprietary medicine by determining that Sterling Drug, Inc., employed a secret process in the manufacture of Bayer Aspirin. The respondent urges this to be a fact and there is some support for this claim. Although I am inclined toward this belief, my reasons are more visceral than factual for I do not find sufficient in the record upon which to hold absolutely that a secret process is used. It is, however, amply demonstrated by the affidavits of respondent that Bayer Aspirin produces a higher quality of aspirin than required by the minimum standards of the United States Pharmacopœia, and it may also be fairly reasoned from this record that the process used in the manufacture of Bayer Aspirin produces a tablet superior to most other aspirins.

I think it unnecessary at this stage of the action to reach the constitutional question. If the position taken by the majority that the limited definition of "proprietary" must be used because the expiration of the letters patent prevent the holding that Bayer Aspirin is a proprietary medicene, then I adopt *in toto* Special Term's treatment and disposition of this issue. I concur with Special Term's finding that "The facts before the court fail to show any such relation in the sale of Bayer Aspirin Tablets to the public health or welfare as would justify the exercise of the police power by the State".

The position thus taken is fortified by the following excerpt from the opinion of the Court of Appeals in *People* v. *Bunis* (9 N Y 2d 1, 4): "the Legislature has prohibited unquestionably legitimate sales and rendered criminal conduct that carries not the slightest taint of corruption or impropriety. This it was not privileged to do; its enactment is arbitrary and violative of due process. (See *Weaver* v. *Palmer Bros. Co.*, 270 U. S. 402; *Defiance Milk Prods. Co.* v. *Du Mond*, 309 N. Y. 537; *People* v. *Estreich*, 297 N. Y. 910; *People* v. *Kuc*, 272 N. Y. 72; *People* v. *Gillson*, 109 N. Y. 389; *Matter of Jacobs*, 98 N. Y. 98.)

"The police power is 'very broad and comprehensive' and in its exercise 'the conduct of an individual and the use of property may be regulated so as to interfere, to some extent, with the freedom of the one and the enjoyment of the other'. (*Matter of Jacobs*, 98 N. Y. 98, 108, *supra*.) But, in order for an exercise of the police power to be valid, there must be 'some fair, just and reasonable connection' between it and the promotion of the health, comfort, safety and welfare of society. (*People* v. *Gillson*, 109 N. Y. 389, 401, *supra*.) 'The property of a citizen * * * may not be taken from him without rhyme or reason' (*Defiance Milk Prods. Co.* v. *Du Mond*, 309 N. Y. 537, 541, *supra*); that is, a statute may not infringe upon the right of an individual 'to pursue a lawful calling in a proper manner, or * * * deprive a person of his property by curtailing his power of sale, * * * unless this infringement and deprivation are reasonably necessary for the common welfare'. (*People* v. *Gillson*, 109 N. Y. 389, 400, *supra*.)"

Notwithstanding what I have written about my concurrence with much of Special Term's memorandum, I cannot agree with its determination that the plaintiff-respondent is entitled to summary judgment on the record before us. In order to find exemption from the registration requirements of article 137 it must be found that Bayer Aspirin is not only a proprietary drug

but that it is also not "poisonous, deleterious and/or habit forming". The respondent makes that claim in its complaint but that allegation is denied in defendants' answer. Special Term states in its memorandum that in the argument before him counsel for the defendants on three occasions conceded "that for the purposes of the motions no claim was made that Bayer Aspirin Tablets are a harmful remedy". (22 Misc 2d 131, 133, *supra*.) The appellants, upon the argument of this appeal, refused to make such a concession although they readily admitted that for the purposes of the appeal it was not necessary to prove that aspirin was harmful. The statement contained in the affidavit of the Secretary of the State Board of Pharmacy that "For the purposes of this motion, defendants' position is that whether the drug is 'harmful' or 'deleterious' is not material and the reference is not intended to indicate that it is" is construed differently by both parties. Respondent claims that this is a concession that aspirin is not a harmful drug and the appellants contend that the statement indicates that whether it is or not is not material to the issue before us. I cannot find in the appellants' affidavits any factual information from which it can be determined here that aspirin is harmful. However, neither can I find any facts in the respondent's affidavits proving that it is not harmful. There are the conclusory assertions by respondent that it is not "harmful", that "It is generally considered the world's safest drug. It is not poisonous, deleterious or habit forming", that it has "extremely low incidence of side effects", that although it is "frequently taken in very large doses with suicidal intent but usually without success". These statements are not sufficiently evidentiary in character to justify summary judgment. This is too serious and important an issue to be determined summarily upon the record before us.

The issues here presented cannot be properly resolved without a trial. Judge DYE in *Falk* v. *Goodman* (7 N Y 2d 87) gives us the principle to be followed in this statement at page 91: "It is well established that summary judgment may not be granted whenever the pleadings raise clear, well-defined and genuine issues; nor may it be granted whenever there is doubt as to the existence of a triable issue or when the issue is arguable since 'issue-finding, rather than issue-determination, is the key to the procedure' (*Sillman* v. *Twentieth Century-Fox Film Corp.*, 3 N Y 2d 395, 404 [1957]). This is so because the granting of such a motion is the procedural equivalent of a trial." In the posture of the action before us it is well to heed the

admonition of Judge LEARNED HAND in *California Apparel Creators* v. *Wieder of California* (162 F. 2d 893, 903), that "Speed and hurry ought to be antipodes of judicial behavior."

The defendants' motion was properly denied but the order granting plaintiff summary judgment should be reversed; none of the parties is entitled to summary judgment.

All concur, except GOLDMAN, J., who concurs in the reversal but votes to deny summary judgment to either party, in an opinion. Present — WILLIAMS, P. J., BASTOW, GOLDMAN and HENRY, JJ.

Judgment reversed on the law, without costs of this appeal to any party and judgment directed in favor of the defendants.